The Denver & Rio Grande Western Railroad Co., Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Docket No. 78861.    Filed August 3, 1962.

---

*Stanley Worth, Esq.*, and *Jules G. Korner III, Esq.*, for the petitioner.

*Richard J. Shipley, Esq.*, for the respondent.

ATKINS, *Judge:* The respondent determined deficiencies in income tax for the taxable years 1954 and 1955 in the respective amounts of $324,210.78 and $34,195.07.

By stipulation the petitioner has waived certain of its allegations of error and the respondent has conceded certain errors in his determinations. The issues remaining for decision are whether the respondent erred in (1) disallowing as deductions for the years 1954 and 1955 the amounts claimed by the petitioner as accruals of vacation allowances and allowing only the amounts actually paid in those years, (2) disallowing as a deduction for 1954 as an ordinary and necessary business expense the amount of $300,000 required by order of a bankruptcy court to be paid to certain bondholders in reimbursement of trustee fees, and other costs incurred in a foreclosure proceeding, and disallowing as a deduction for 1955 as ordinary and necessary business expense the amount of $927.92, representing an amount paid to the trustee under the bond issue for distributing to the bondholders a

portion of the above amount of $300,000, (3) disallowing for 1955 as an ordinary and necessary business expense, a contribution of $1,000 for the purpose of obtaining legislation authorizing construction of a dam, and (4) disallowing as a deduction for 1955 the value of a retired narrow gage locomotive claimed to have been transferred for the use of the City of Gunnison, Colorado.

## FINDINGS OF FACT.

Some of the facts are stipulated and the stipulations are incorporated herein by this reference.

The petitioner is a Delaware corporation operating a common carrier by rail principally in Colorado and Utah, with principal office and place of business at Denver, Colorado. Its income tax returns were filed with the district director of internal revenue for the district of Colorado.

The petitioner has at all material times kept its books on an accrual method of accounting in accordance with the requirements of the Interstate Commerce Commission.

The petitioner has had agreements, through labor unions, with its nonoperating employees since 1942 and with its operating employees since 1949, under which each employee was entitled to an annual vacation of a specified number of workdays with pay, or pay in lieu thereof, provided the employee had rendered service of a specified number of days in the preceding calendar year. The number of days of vacation to which an employee was entitled varied with the number of years the employee had worked for the company.

Such agreements provided that vacations might be taken from January 1 to December 31, and that due regard, consistent with requirements of service to the public, should be given to the desires and preferences of the employees in seniority order when fixing the dates for their vacations. While the manner of computing the amount of such vacation pay varied, in general it was to be based upon the rate of compensation existing during the vacation or immediately prior to the taking of the vacation or pay in lieu thereof (in the case of operating employees the vacation allowance was to be a specified fraction of the compensation earned during the calendar year preceding the year in which the vacation was to be taken, but in no event less than an amount computed at the rate of pay for the last service rendered).

Up to the end of the year 1953 these agreements provided that no vacation with pay, or payment in lieu thereof, would be due an employee whose employment had terminated, other than by retirement under the Railroad Retirement Act, prior to the taking of his vacation (in the case of operating employees the provision is "prior to the scheduled vacation").

By agreements dated August 21, 1954, in the case of the nonoperating employees, and August 17, 1954, in the case of the operating employees, both agreements being effective as of January 1, 1954, the original vacation agreements were amended. It was provided that if a nonoperating employee who had performed the necessary qualifying service in the year prior to the year of his death, or in the year of his death, should die before receiving his vacation or payment in lieu thereof, payment of the allowance for such vacation would be made to his surviving widow, or if none, then on behalf of dependent minor children, if any. It was provided that if an operating employee who had performed the necessary qualifying service in the year prior to the year of his death should die before receiving his vacation or payment in lieu thereof, payment should be made to his widow.[1] The amending agreements also provided, effective with the year 1954, for an additional week of vacation each year with pay, or pay in lieu thereof, in the case of qualifying employees who had had 15 years' service and who had rendered a specified number of days of service in the preceding year and prior years.

Prior to the year 1954, notwithstanding that the petitioner employed an accrual method of accounting, the amounts paid to its employees by reason of vacations were taken as deductions from gross income both in its books and in its income tax returns for the years in which such payments were made, no provisions for accruing such allowances being made either in its books or in its returns, by reason of the uncertainties in its contracts with its employees as to the employees' rights to such vacations.

The petitioner in its 1954 accounts set up in December 1954 an accrual for vacation allowances in the amount of $1,529,738.61 by a charge to an account "P & L Miscellaneous Debits" and a credit to an account "Other Unadjusted Credits." Such accrual was in addition to the amounts actually paid petitioner's employees during the year 1954 as vacation allowances which were deducted as operating expenses in petitioner's books. This accrual was based, at least in part, upon the actual vacation pay allowances paid in 1954.

The petitioner keeps records which show, among other things, payments of vacation pay where employees have died. Such records in-

---

[1] The amending agreement of August 21, 1954, with respect to nonoperating employees, also contained certain provisions with respect to how to compute days of service and continuous service for vacation qualifying purposes. For example, days on which an employee did not render service because of sickness or injury were to be included, to an extent specified; and time spent in the Armed Forces was to be included under certain circumstances. It was also provided that if an employee who had rendered qualifying service in a year should be laid off, but return the next year and perform a specified amount of service, he should be entitled to a vacation in the year of return. (The original agreement in 1949 with respect to operating employees had contained certain provisions with respect to the manner of computing days of service and continuous service for vacation qualifying purposes in cases of absence on account of illness and in cases of discharge and reinstatement of employees.)

clude the names of employees who have died and left either a widow or children, and the names of those whose allowances were forfeited because the employee was not survived by a wife or dependent minor children. It kept such records in 1954 and 1955, but such records for those years have been destroyed with the permission of the Interstate Commerce Commission. The earliest records which the petitioner now has showing vacation payments and forfeitures due to death are for the year 1957. In that year there were five cases in which the vacation benefits were forfeited for the reason that there was not left a widow or children. There was no change between the years 1954 and 1955 and the year 1957 in the vacation pay agreements between the petitioner and its employees. The total number of petitioner's employees was 6,010 in 1954, 6,047 in 1955, and 5,871 in 1957.

In its income tax return for the taxable year 1954 the petitioner claimed as a deduction from gross income the amount actually paid as vacation allowances during that year and also the amount of the above accrual of $1,529,738.61. In the return this amount was set forth in two items, namely, $1,265,055.10 as "Estimated Vacation Allowances—2 Weeks," and $264,683.51 as "Estimated Vacation Allowances—3rd Week 1939 I.R.C." By reason of the elimination of section 462 from the Internal Revenue Code of 1954, the petitioner filed Form No. 2175, the effect of which was to eliminate from the deduction claimed in its 1954 return all of the above accrual except the amount of $264,683.51 which was computed to be that portion of the accrual which related to the third week of vacation allowance to which certain qualifying employees were for the first time entitled effective January 1, 1954.

The petitioner in its books and accounts for the calendar year 1955 charged its operating expenses with accrued vacation allowances earned in that year and payable the following year in the estimated amount of $1,449,063.77, based upon its actual payments on that account during the year 1955, and deducted such amount from its gross income in its income tax return for the taxable year 1955.[2] Since the actual payments in 1955 by reason of vacation allowances ($1,449,063.77) were less than the amount accrued in December 1954 ($1,529,738.61), the difference of $80,674.84 was charged to an account "Accrued Accounts Payable" and credited to an account "P & L Miscellaneous Credits" by journal entry of December 1955. Upon instructions from the Interstate Commerce Commission the accrual which, in the journal entry of December 1954, was credited to the account "Other Unadjusted Credits" was changed to the above account "Accrued Accounts Payable" during the year 1955.

---

[2] It appears from item 30 of a schedule attached to the return for 1955 that the petitioner also deducted as vacation pay, in addition to the stipulated amount, a net amount of $70,204.71.

In the notice of deficiency the respondent denied the petitioner the right to make any accrual for vacation allowances during either of the taxable years 1954 or 1955, allowing as a deduction only the amounts actually paid in those years. In such notice the respondent stated with respect to the disallowance for the taxable year 1954:

It is held that the deduction for vacation pay allowances is $1,265,055.10 instead of $1,529,738.61 as used in your computation of 1954 income. The difference between these amounts or $264,683.51 is denied as a deduction.

With respect to the disallowance for the taxable year 1955, he stated:

It is held that the deduction for vacation pay allowance is overstated in the amount of $70,204.71. Income is adjusted by eliminating this amount as an income tax deduction.

*Reimbursement of Costs of Foreclosure on Utah Fuel Co. Stock.*

In 1935 the Denver & Rio Grande Western Railroad Co. filed a petition with the United States District Court for the District of Colorado for a reorganization under the terms of section 77 of the Bankruptcy Act. The proceedings resulted in a plan of reorganization which was confirmed by the court in 1944, and on April 10, 1947, the court entered a consummation order and final decree.[3]

At the time it went into receivership the railroad had outstanding the following bond issues:

1. Rio Grande Western Railway Company first consolidated mortgage bonds.
2. Refunding and improvement mortgage bonds.
3. General mortgage bonds.

All these bonds were secured by mortgages and liens upon the debtor's assets, with priority in the order named. They were also secured by a lien upon all the 100,000 outstanding shares of capital stock of the Utah Fuel Co. Such stock was not a part of the debtor's estate, title to such stock and the equity of redemption therein being owned by the Missouri Pacific Railroad and the Western Pacific Railroad, which at that time were the debtor's two stockholders.

---

[3] By a prior order of the court on March 6, 1947, the court approved the determination of the reorganization committee that the reorganized company under the plan of reorganization should be the existing company, a Delaware corporation, with its certificate of incorporation amended in accordance with the provisions of the plan. The reorganization committee had made application for, and had received, an order of the Interstate Commerce Commission approving the transfer of the debtor's property to the reorganized company, the assumption of certain obligations and liabilities by the reorganized company, certain mergers and transfers, and the issuance of certain securities by the reorganized company as contemplated by the plan of reorganization. The final decree of the District Court on April 10, 1947, provided that as of April 11, 1947, all the business and affairs of the debtor and all right, title, and interest in the debtor's property should vest in and become the absolute property of the reorganized company, free and clear of all rights, claims, interests, liens, and encumbrances of the creditors of the debtor and of the holders of shares of capital stock of the debtor, that the debtor should thereupon be released and discharged from all its debts and liabilities, and that the reorganized company and its property should also be free and clear of all such rights, claims, interests, liens, encumbrances, debts, obligations, and liabilities, except as otherwise provided in the order.

The decree of April 10, 1947, declared all three bond issues, and all indentures and agreements supplemental or amendatory thereto, null and void, satisfied, canceled, and released, except insofar as they constituted liens on the Utah Fuel Co. stock, and it was provided that the decree neither affected nor purported to affect those liens. The trustees of the bondholders were authorized and directed to continue to act in that capacity with respect to the Utah Fuel Co. stock, subject to the terms and conditions of their respective mortgages.

Paragraph 7 of such decree authorized and directed the reorganized company (the petitioner herein) to pay the reasonable and necessary expenses of the reorganization committee in carrying out and putting into effect the plan of reorganization, and other expenses and costs of the administration of the proceedings, including allowances of fees or compensation for services and reimbursement of expenses incurred in connection with the proceedings or the plan by or on behalf of the parties to the proceedings. Such decree provided in part:

(7) * * * For the purposes of this paragraph (7), all compensation for services rendered and all expenses incurred by the trustees now acting under the mortgages referred to in paragraphs (16) and (18) of this order which would have been secured, respectively, by the liens of such mortgages, if such mortgages had not been satisfied, cancelled, and released by, or pursuant to, this order, shall be deemed to be expenses incurred in connection with these proceedings or the Plan.

    *        *        *        *        *        *        *

(19) In confirmation of the termination of the aforesaid mortgages and the respective liens thereof to the extent specified in paragraph (18) of this order, the trustees now acting under said mortgages are hereby authorized and directed, severally and respectively, to execute and deliver instruments of satisfaction and release * * *. Whether executed before or after the Closing Time, each such satisfaction and release shall be effective as of the Closing Time, and as of that time each of said trustees shall, except with respect to the Utah Fuel Company stock referred to in paragraph (18) of this order, be discharged as a trustee and relieved of all of its obligations, liabilities, responsibilities, and duties with respect to the particular mortgage, and all indentures and agreements supplemental thereto, under which it is acting as trustee, but with respect to said Utah Fuel Company stock said trustees shall continue to act as trustees under and subject to the terms and conditions of their respective mortgages, except as otherwise specifically directed in this order, the trustees under each of the aforesaid mortgages are further authorized and directed to transfer, convey, and deliver or release to the Reorganized Company all shares of stock (other than said stock of the Utah Fuel Company), evidences of indebtedness and other securities, all money, credits, choses in action, and all other property, rights, and interests of every kind or description held or claimed by them as trustees as aforesaid, and to execute and deliver upon the request of the Reorganization Committee or the Reorganized Company any additional conveyances, bills of sale, assignments, or other instruments that may be necessary or proper to accomplish and evidence the satisfaction, release, and cancellation of their respective mortgages and any indentures and agreements supplemental thereto to the extent specified in paragraph (18) of this order. The said trustees are directed to execute their respective releases and other instruments as aforesaid and to

surrender property as aforesaid now held by them as trustees under their respective mortgages, for the sole and express purpose of remising, releasing, conveying, and quitclaiming whatever interest such trustees have as trustees under their respective mortgages and indentures supplemental or amendatory thereto, other than their respective interests in or claims to said stock of the Utah Fuel Company * * *. The Reorganized Company shall pay to each of said trustees reasonable compensation for services rendered and reimbursement for expenses incurred by it, including attorney's fees, in securing an adjudication of its interests or claims, if any, as trustees, in and to said stock of the Utah Fuel Company, in such amount as may hereafter be approved and allowed by this Court.

      *        *        *        *        *        *        *

(50) The Court hereby reserves jurisdiction to allow fees or compensation for services and reimbursement for expenses heretofore or hereafter rendered or incurred in connection with these proceedings or the Plan * * *

Subsequent to the entry of the consummation order and final decree, and in performance of its trust duties, the trustee of the first consolidated mortgage bonds instituted, on May 15, 1947, a proceeding in the Supreme Court of the State of New York to establish and enforce the lien of its bondholders in the Utah Fuel Co. stock. Also in pursuance of their trust duties, the trustees of the refunding and improvement mortgage bonds and of the general mortgage bonds appeared in such suit and asserted the liens of their bond issues in such Utah Fuel Co. stock. The petitioner was not a party to the New York State court proceeding.

In the proceeding in the Supreme Court of the State of New York the senior lien of the first consolidated mortgage bonds was fixed at $6 million and the lien of the refunding and improvement mortgage bonds was fixed at a sum in excess of $16 million. In that proceeding the stock of Utah Fuel Co. was sold for $6,800,000. The Supreme Court of New York ordered that the expenses of litigation, $414,384.30 (consisting of trustees' fees and expenses, fees of counsel to the trustees and reimbursement of expenses, compensation for services of certain intervening bondholders and reimbursement of their expenses, and referees' fees) be paid out of the proceeds from the sale of the stock prior to distribution. Of this amount, $395,884.30 was directed by the State court to be paid out of the $800,000 portion of the proceeds which otherwise would have been available for distribution among the holders of the refunding and improvement mortgage bonds, and the balance of $18,500 was directed to be paid from the proceeds of the sale which would otherwise have gone to the holders of the first consolidated mortgage bonds. Distribution was then made of the remainder of the proceeds.

Thereafter on July 7, 1952, Goldman, Sachs & Co., holder of $3,999,000 face amount of the refunding and improvement mortgage bonds, filed a petition in the bankruptcy proceeding in the United States District Court of Colorado. In reliance upon the provisions

of the consummation order and final decree of April 10, 1947, particularly the above-quoted paragraphs 7, 19, and 50, Goldman, Sachs & Co. requested the court to determine that the expenses incurred by the holders of the refunding and improvement mortgage bonds in the amount of $395,884.30 were just and reasonable and to direct that the reorganized company pay to such holders their expenses so incurred in that amount. In its petition Goldman, Sachs & Co. alleged that the trust indentures of the various bond issues provided that the debtor should pay the reasonable compensation for all services rendered by the trustees of the bond issues in the execution of their trust duties, that among such trust duties of the trustees was the duty to sell the stock of Utah Fuel Co. in the event of default by the debtor in payment of the bond issues, and that under the trust indentures the expenses of such trustees in the performance of their trust duties were made a lien upon the mortgaged property which included the property of the debtor and the stock of the Utah Fuel Co.

The petitioner filed its answer to the above petition in the District Court of Colorado on September 4, 1952, praying that the petition be dismissed. Therein it denied that the services and expenses in the New York litigation relative to the Utah Fuel Co. stock were rendered or incurred in connection with the proceedings and plan of reorganization of the debtor.

In a Memorandum Opinion and Order filed on September 30, 1953, the District Court denied the prayer of the petitioner for an order denying and dismissing the petition and ordered that the matter be set down for further hearing upon the motion. Therein the court stated:

Surely it cannot be said that when this Court had jurisdiction over the debtor corporation, the reorganized company, the indentured trustees, the bondholders and the administration of the respective trusts and mortgages, it is prohibited from determining whether the reorganized company or the bondholders shall bear the costs and expenses and fees which are incidental to a determinaton of the latter's rights in and to the security, simply because it does not have jurisdiction over the security itself. The security and its disposition is one thing. The duty of determining who shall, in the final analysis, bear the reasonable costs of the New York litigation which, truly enough, concerned that security, is quite another. This Court has not in the past and will not now adjudicate with respect to the former; but heretofore it expressly assumed the latter by entering the order here in concern and certainly retains jurisdiction to enforce that order and prevent it from becoming a nullity.

\*        \*        \*        \*        \*        \*        \*

Finally, it must be borne in mind that the Consummation Order and Final Decree provided that this Court, as distinguished from any other tribunal, should determine, approve and allow the reasonable amount of the costs and fees and expenses of what, in effect, was and has herein been referred to as the New York litigation. In view of this, the amount of recovery, if any, is of course not fixed by the sums which the New York Court deemed fit to award. Proper evidence has still to be offered on the basis of which this Court can make its

own independent determination concerning the reasonable value of the various services rendered and of the reasonable costs and expenses incurred.

The petitioner appealed to the United States Court of Appeals for the Tenth Circuit from the Memorandum Opinion and Order of the District Court, and under date of April 29, 1954, such court filed its opinion affirming the judgment of the District Court stating in part:

The plan which was accepted and approved in this case required the reorganized company to pay the fees and expenses of the trustees, including attorney fees, in establishing their interests and claims to collateral security which was pledged for their benefit. * * * It appears to us that it was the purpose of the plan and the consummation order to relieve the trustees, and through them, the bondholders, of the expenses of foreclosure and to place this burden upon the reorganized company. When the consummation order and final decree was entered there was no objection, and it became final. * * *

The consummation order made the Rio Grande primarily liable for the costs and expenses in question. The New York court required the trustees to pay them under the terms of the mortgage indentures. They were paid from funds which were held by the trustees for the benefit of the bondholders and which would have been distributed to the bondholders if the Rio Grande had complied with the terms of the consummation order. * * * The consummation order provides that the Rio Grande shall pay only reasonable compensation for the services of the trustees and expenses incurred by them including attorney's fees, in securing an adjudication of the interests and claims of the trustees. Any other expenditures or charges against the fund are not the responsibility of the reorganized company.

On December 30, 1954, the District Court entered its Findings of Fact, Conclusions of Law, and Decree. The parties waived all rights to file motions and to further appeal. The court found in part as follows:

3. * * * the respective Trust Indentures securing said three bond issues provided that the debtor railroad should pay the reasonable compensation and expenses for all services rendered by the trustees under said Trust Indentures in the execution of their trust duties;

4. That included in the duties of said trustees was the obligation to sell the stock of the Utah Fuel Company in the event of the default of the debtor in the payment of bond issues and to apply the proceeds of such sale to the satisfaction of said bond issues in the order of their priority of lien;

\*          \*          \*          \*          \*          \*          \*

13. That pursuant to the stipulation of the parties hereto and in pursuance of paragraph (19) of the Consummation order and Decree herein of April 10, 1947, this court finds that the sum of $300,000 is reasonable compensation for services rendered and reimbursement for expenses incurred, including attorneys' fees in securing an adjudication of their interests or claims as Trustees in and to the stock of the Utah Fuel Company in connection with the foreclosure proceedings in New York referred to and the sale of the Utah Fuel Company stock and disposition of its proceeds;

In its Conclusions of Law the court stated in part:

1. That under the Consummation Order and Decree of this Court entered April 10, 1947, (paragraph (19)) the Reorganized Company was required to pay to

each of the trustees referred to herein reasonable compensation for its services rendered and reimbursement for expenses incurred by it, including attorneys' fees, in securing an adjudication of its interests or claims, if any, as trustees in and to said stock of the Utah Fuel Company in such amount as approved and allowed by this Court.

2. That as a result of the proceedings in the Supreme Court of the State of New York the holders and owners of the Refunding and Improvement Mortgage Bonds have paid and discharged an obligation which in equity and good conscience ought to have been paid by the Reorganized Company pursuant to the Consummation Decree of this Court and that to the extent of the sum of $300,000 said holders and owners of said bonds are entitled to reimbursement from said Reorganized Company therefor.

\* \* \* \* \* \* \*

4. That the attorneys' fees for petitioner herein, in the amount of $40,000 are a proper charge upon and should be paid out of the fund hereinafter directed to be paid by the Reorganized Railroad Company before any distribution to bondholders.

It was ordered that the petitioner pay the sum of $300,000, of which $40,000 was ordered to be paid to the attorneys for Goldman, Sachs & Co. for services in the proceeding in the United States District Court, and $260,000 was ordered to be paid to the trustee of the refunding and improvement mortgage bonds for distribution to the bondholders. Payment was duly made by the petitioner.

The petitioner deducted the amount of $300,000 as an accrued liability in its income tax return for the taxable year 1954. The respondent in the notice of deficiency disallowed the claimed deduction in full with the following statement: "It is held that litigation expense of $300,000 is not an allowable deduction for income tax purposes."

In its decision of December 30, 1954, the District Court provided that the petitioner should pay, in addition to the $300,000 above referred to, the fees and expenses of the trustee of the refunding and improvement mortgage bonds in making distribution of the $260,000 to the bondholders and receiving and canceling the bonds. During the year 1955 the petitioner paid an amount of $927.92 pursuant to this provision of the District Court decree. In its income tax return for the taxable year 1955 it deducted such sum of $927.92. In the notice of deficiency the respondent disallowed the claimed deduction with the following statement: "It is held that litigation expenses of $927.92 is not an allowable deduction for income tax purposes."

### Contribution of $1,000.

Early in 1955, George P. Backman, the executive secretary of the Chamber of Commerce of Salt Lake City, Utah, solicited a contribution from petitioner for a program to promote the construction of a proposed dam, commonly known as the Echo Park Dam, on the north-

ern part of the common border between Utah and Colorado.[4]   On or about February 15, 1955, petitioner transmitted to Backman a check for $1,000 payable to the Chamber of Commerce of Salt Lake City. This money was not used by the chamber of commerce, but was placed in a special bank account entitled "Executive Committee of the Colorado River Development Association" for the use of Backman and George D. Clyde, the then director of the Utah Water & Power Board and Commissioner of Interstate Streams, in connection with the above-described program.

The Echo Park project was part of an overall proposed Federal plan for development of the water resources of the upper Colorado River basin and authorization for its construction was contained in several bills pending before Congress in 1955, to wit: H.R. 270, H.R. 2836, H.R. 3383, H.R. 3384, H.R. 4488, and S. 500.   Hearings on these bills were held by the Subcommittee on Irrigation and Reclamation of the Committee on Interior and Insular Affairs of both the House of Representatives and the Senate during February, March, and April 1955.

Interests of the lower Colorado River basin initially opposed the entire upper Colorado River basin project.   Subsequently, when opponents of the overall project apparently were unable to sustain their objection, opposition was directed against specific individual projects included in the overall project.   Opposition to the Echo Park dam project was especially strong in view of the fact that the project necessitated flooding an area which included at least a part of the Dinosaur National Monument and Park.   Many naturalist, wildlife, and similar organizations opposed the Echo Park project and succeeded in creating considerable publicity adverse to the project.

Due to the importance of the proposed Echo Park dam as a means of providing water for the principal industrial and agricultural portions of the State of Utah, Backman and Clyde undertook on their own a program to counteract the unfavorable publicity against the Echo Park dam project.   In order to carry out this program, they solicited contributions, first from interested State, county, and local authorities and then from the principal business enterprises in the area.   The contributions received, including petitioner's $1,000, were expended in general, to counteract the adverse publicity against the

---

[4] In his letter of solicitation addressed to the petitioner, Backman stated in part:

"Following up our discussion of some weeks ago with respect to the Rio Grande helping us with our Grass Roots program on Echo Park, we would certainly appreciate receiving your contribution to such an undertaking inasmuch as the funds which I have obtained from some of our fine local organizations are practically used up.

    *        *        *        *        *        *        *

"As you are aware, the formal hearing will be held in Washington before the Senate Committee on February 28 and the House Committee on March 9, so I will really need some money to take care of special people who have agreed to appear but whose expenses cannot be covered by the State."

project and to gain support for the passage of Federal legislation authorizing the Echo Park dam project.[5]  The contributions were spent principally for traveling expenses of witnesses who appeared before congressional committees in Washington, D.C., and some of whom directly contacted Congressmen, traveling expenses of various persons who contacted interested individuals and groups throughout the country, the cost of printing an article for a national magazine and several brochures, and salaries of clerical and stenographic help.

The petitioner was interested in the Echo Park dam project because it expected to profit by transporting construction materials, especially cement, to the railhead nearest to the dam.  In addition, petitioner was considering the possibility of building a rail line into the area surrounding the project site in order to provide service in connection with the development of phosphates and other mineral resources which would be made possible by the electric power which would be brought into the area by the project.  Petitioner also anticipated increased freight traffic from the production of agricultural crops in new areas opened to irrigation by the Echo Park project.

Petitioner deducted the $1,000 contribution in its income tax return for the taxable year 1955 as a miscellaneous operation expense.  In the notice of deficiency, the respondent disallowed the deduction on the ground that it was not considered to be an ordinary and necessary business expense.

The contribution of $1,000 was made by petitioner for lobbying purposes, for the promotion of legislation, and for carrying on propaganda related to the promotion of legislation.

### Contribution of Locomotive.

In the year 1955 the petitioner retired from service a narrow gage locomotive, No. 268, which had been in service for 73 years.  It was rich in historic tradition and had been used for most of its years of service in the petitioner's railroad division that had included Gunnison, Colorado.

Members of the Gunnison Pioneer Association, some of whom were former railroad people, and officials and other citizens of the city of Gunnison had expressed the desire to obtain the locomotive and place it on display as a reminder of the past glory of Gunnison as a railroad center.  The petitioner, the Pioneer Association, and the City of Gunnison, therefore, reached an understanding that petitioner would donate this locomotive to the Pioneer Association, which would assume the responsibility for its maintenance and care, and that the locomotive would be placed on city property for public display.

---

[5] At the time of the trial, the Echo Park dam project had not been authorized by Congress but Backman's group was still working for the passage of authorizing legislation by Congress.

In accordance with the agreement the locomotive was turned over to the Pioneer Association. No formal deed of gift, bill of sale, or similar instrument of conveyance was executed. The locomotive was placed in a city park of the city of Gunnison on display to the general public as a historical exhibit. The petitioner had in the past donated locomotives to communities which had not maintained them in a manner to reflect credit on the railroad or the community where they were displayed. When the proposal of Gunnison was received by the petitioner it sought to find a way to avoid the situation which had arisen in the past, and this was the reason for the transfer of locomotive No. 268 to the Gunnison Pioneer Association.

The locomotive has remained on display in the Gunnison City Park at all times since 1955, except for a part of the year 1959 when petitioner borrowed it from the Pioneer Association and the City of Gunnison for the purpose of exhibiting it at the Denver Centennial Exhibition in Denver, Colorado.

In its income tax return for the taxable year 1955, the petitioner claimed a deduction of $8,000 as a charitable contribution by reason of the donation of locomotive No. 268. The respondent disallowed this contribution as a deduction for income tax purposes. The parties are agreed that in the event that it is held that the conveyance of locomotive No. 268 constitutes a charitable contribution, the amount to be allowed as a deduction by reason thereof is $6,000.

The transfer by the petitioner of locomotive No. 268 to the Gunnison Pioneer Association in the taxable year 1955 was a contribution for the use of the City of Gunnison, Colorado, for exclusively public purposes.

### OPINION.

The petitioner contends that for the taxable year 1954 it is entitled to deduct an amount of $1,529,738.61 as a proper accrual of vacation allowances earned by its employees in that year, but payable in the next year, and that it is also entitled to deduct for 1954 the amount which it actually paid out in that year as vacation allowances which had been earned in the prior year. It contends that for the taxable year 1955 it is entitled to accrue and deduct vacation pay on the basis of services rendered in that year and that the respondent erred in limiting the deductible amount to the amount actually paid in that year, $1,449,063.77.[6] Its position is that prior to the amendments

---

[6] The respondent allowed as a deduction for 1955 an amount of $1,449,063.77, albeit as the amount actually paid in 1955, whereas the petitioner contends for the deduction of this item as an accrual based upon services rendered in 1955. The petitioner also alleges that the respondent erred in disallowing as vacation pay an amount of $70,204.71 for 1955. As pointed out in the Findings of Fact, Item 30 of a schedule attached to the return for 1955 indicates that petitioner deducted as vacation pay an amount of $70,204.71, in addition to the amount of $1,449,063.77 stipulated as the amount charged in that year as accrued vacation allowances earned in that year. There is no direct evidence explaining this amount. However, in the petition it is stated to be an under-accrual of

made in its contracts with its employees, effective in 1954, there was such uncertainty as to its liability to make payments that such allowances did not accrue until the year of payment, but that commencing with 1954 the uncertainties as to payment were lessened to the extent that it was proper to accrue vacation allowances earned.

The respondent, in determining the deficiencies involved, disallowed all amounts claimed as accruals of vacation allowances in both years and instead allowed only the amounts actually paid. He contends that neither before nor after the 1954 amendments were the vacation allowances properly accruable in the years the services were rendered.

Under the contracts as they existed up to the end of 1953, no vacation with pay, or payment in lieu thereof, would be due an employee whose employment had terminated, other than by retirement under the Railroad Retirement Act, prior to the taking of his vacation. Thus, whether or not the petitioner would be required to pay a vacation allowance to a particular employee who had rendered the qualifying service in a particular year depended upon continued employment of such employee at the time of the scheduled vacation, except in the case of retirement. After the amendments, made effective for the year 1954, substantially the same condition prevailed except that it was provided that if a qualified operating employee died before taking his vacation the allowance would be paid to his widow, and that if a nonoperating employee died payment would be made to his surviving widow, or if none, then on behalf of any dependent minor children. While these changes in the contracts no doubt had the effect of lessening the probability of forfeitures of vacation allowances, there still remained no provision for payment in the event an employee should die without surviving wife or minor dependent children. And it still remained true that if, before taking his vacation, an employee's employment should terminate, except for retirement, no vacation with pay, or payment in lieu thereof, would be due the employee.

Section 446 of the Internal Revenue Code of 1954 provides that taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books. Section 461 of the Code provides that the amount of any deduction or credit shall be taken for the taxable year which is the

---

vacation pay for the taxable year 1954. On the other hand, the stipulated facts show that the overall amount accrued as vacation pay by the petitioner for 1954 exceeded the actual payments made in 1955 by an amount of $80,674.84, and that the petitioner in 1955 made a credit in that amount to "P & L Miscellaneous Credits" account. From the schedule referred to above it appears that the amount actually paid in 1955 on account of *third week* vacation allowances earned in 1954 was $334,888.22, whereas, as we have found, the amount accrued by the petitioner in 1954 on account of *third week* vacation allowances was $264,683.51. The difference between these two figures is $70,204.71. It therefore seems that the $70,204.71 represents the amount by which the petitioner allegedly under-accrued the *third week* vacation allowances in 1954.

proper taxable year under the method of accounting used in computing taxable income. Here the petitioner kept its books and filed its income tax returns upon an accrual method of accounting. Under such method the deduction of an item depends upon whether all the events have occurred which determine the liability of the taxpayer to pay it; a liability does not accrue as long as it remains contingent. *United States* v. *Anderson*, 269 U.S. 422, and *Brown* v. *Helvering*, 291 U.S. 193. The fact that the percentage of items which will be paid can be estimated with reasonable accuracy is not sufficient to support accruals. The individual items must represent fixed liabilities. *Brown* v. *Helvering, supra,* and *Commissioner* v. *Milwaukee & Suburban Transport Corporation,* 367 U.S. 906, which reversed 283 F. 2d 279, which in turn had reversed a Memorandum Opinion of this Court.

In *Tennessee Consolidated Coal Co.,* 15 T.C. 424, appeal dismissed (C.A. 6), the taxpayer had an agreement with a labor union which provided that each mine worker with a record of 12 months' continuous employment immediately preceding June 1 of any year should be entitled to a specified vacation allowance on that date. In that case, in holding that the allowances were not accruable prior to the date specified for payment, we stated in part:

The contract, providing for vacation payments, specifically states that certain requirements must be met before the petitioner is required to make payments. As to any particular miner, as we interpret the contract, he (the miner) has not established any right to any part of his vacation pay until he has completely complied with every part of the contract. The circumstances in the *Continental Tie & Lumber Co.* case are different from those of the case at bar, in that there all had been done that could have been done to establish liability; all that remained to be done was to calculate the liability, but in the instant case vital facts remained to be determined, i.e., how many of the miners, if any, would qualify for vacation payments on the date of the proposed payment, and how much it would be. As we understand the contract, every miner who collects the vacation payments must, individually, measure up to specified standards.

The possible occurrence of a condition subsequent to the creation of a liability is not grounds for denying the accrual of the liability at the time of its creation. *United States* v. *Boston & Providence R.R. Corporation,* 37 Fed. (2d) 670; *The Boston American League Baseball Club,* 3 B.T.A. 149. Liability for payment in the instant case depended on a condition precedent, i.e., whether or not the miners, individually, were working for the company on the date required in the contract and had complied with the requirements contained therein. "The accruability test of a debt is not certainty of payment, but rather certainty of its liability * * *." *Trans-California Oil Co., Ltd.,* 37 B.T.A. 119, 127. The petitioner's liability for the vacation payments here in question did not become certain until the arrival of the date specified in the contracts. * * *

In *Texaco-Cities Service Pipe Line Co.* v. *United States,* (Ct. Cl.) 170 F. Supp. 644, there was involved a vacation allowance agreement which, prior to 1945, provided that an employee would lose the right to vacation pay, which he otherwise would receive, if he voluntarily

resigned, was discharged for cause, failed to take his vacation before retirement, or died before taking his vacation. The court there held that until all the conditions were met by a particular employee there was no liability which would warrant taking a deduction on an accrual basis. The agreement involved in that case was amended, effective for the year 1945, to provide that an employee was entitled to a vacation allowance notwithstanding that his service might be terminated due to permanent layoff, voluntary resignation, involuntary resignation due to sickness, or discharge, except for dishonesty. It was further provided that the estate of an employee who died should be paid the allowance. It was held that under the contract as amended the taxpayer was entitled to deduct accrued vacation allowances earned in 1945. The result was that for 1945 the taxpayer was permitted to deduct both the amounts paid in that year, which had been earned in the prior year, as well as the amounts earned in that year.

It will be seen that the original agreement in the above case was essentially the same as the original agreements involved in the instant case. On the other hand, the amended agreement in that case was vastly different from the amended agreements in the present case. There all contingency had been removed and an unqualified liability arose in the year of the rendition of the qualifying service. In the instant case, even under the amended agreements, no unqualified liability arose during the year of the rendition of the qualifying service.

Under the circumstances we are constrained to the view that even after the 1954 amendments to the agreements there remained such contingency as to preclude the accrual of vacation pay in the years in which the services were rendered. We conclude, therefore, that the respondent correctly determined that the petitioner was entitled to deduct from gross income of the taxable years 1954 and 1955 only the amounts of vacation allowances actually paid in those years.[7] In view of our conclusion it is unnecessary to consider the respondent's alternative contention that the accrual and deduction of such allowances in the year of rendition of the qualifying service would amount

[7] We have carefully considered the case of *Masonite Corp.* v. *Fly*, (S.D. Miss., Apr. 4, 1961, 7 A.F.T.R. 2d 1146, 61–1 U.S.T.C. par. 9355), cited by petitioner, but consider it distinguishable. That case involved an agreement under which employees who had been employed for 1 year prior to January 1, 1945, were eligible for a vacation with pay sometime between May 1, 1945, and August 31, 1945. The contract also provided that employees absent from work due to illness, accident, temporary lack of work, or other causes beyond their control would not become ineligible for their vacations, but that no vacation or vacation pay would be allowed any employee after his resignation or discharge. It was there held that the rendition of the qualifying service created a liability and that the labor contract did not require employment on May 1, 1945, as a condition precedent to the creation of a liability. This was based on a decision of the Supreme Court of Mississippi, the State in which the contracts were executed and the employees worked. It was therefore held that the provision that no employee should be eligible for vacation pay after his resignation or discharge was not a condition precedent to liability, but was a condition subsequent which had no effect upon the right of accrual. As stated hereinabove, we think, based on the cases cited, that in the instant case the conditions were conditions precedent to the creation of a liability on the part of the petitioner.

to a change of accounting method requiring the consent of the respondent under section 446(e) of the 1954 Code and section 1.446–1(e)(2) of the Income Tax Regulations promulgated thereunder.

We have carefully considered the petitioner's contention that I.T. 3956, 1949–1 C.B. 78, supports its position that it was entitled to accrue in 1954 and 1955 vacation allowances based on services rendered in those years (and also its claim that it is entitled to deduct in 1954 the payments actually made, on the ground that prior to the 1954 amendments to the employment agreements there was a substantial condition precedent to its liability whereas afterwards there was not). The petitioner points out that although the respondent issued Rev. Rul. 54–608, 1954–2 C.B. 8, revoking I.T. 3956, such revenue ruling was specifically made nonapplicable to taxable years ending before June 30, 1955, and that further rulings and section 97 of the Technical Amendments Act of 1958, as amended by section 2, Pub. L. 86–496 (June 8, 1960), further extended its nonapplicability to taxable years ending prior to January 1, 1963. Section 97 as amended provides:

SEC. 97. DEDUCTIBILITY OF ACCRUED VACATION PAY.

Deduction under section 162 of the Internal Revenue Code of 1954 for accrued vacation pay, *computed in accordance with the method of accounting consistently followed by the taxpayer in arriving at such deduction*, shall not be denied for any taxable year ending before January 1, 1963, solely by reason of the fact that (1) the liability for the vacation pay to a specific person has not been clearly established, or (2) the amount of the liability to each individual is not capable of computation with reasonable accuracy, if at the time of the accrual the employee in respect of whom the vacation pay is accrued has performed the qualifying service necessary under a plan or policy, ('communicated to the employee before the beginning of the vacation year) which provides for vacations with pay to qualified employees. [Emphasis supplied.]

I.T. 3956, which was continued in effect for certain purposes throughout and beyond the taxable years here involved, provided that vacation allowances are properly accruable as of the end of the years in which qualifying services are rendered, and that accrual should be made for both prior and future years. However, in such ruling it was also provided that an accrual basis taxpayer might accrue and deduct vacation pay for the year in which paid if that had been its consistent practice, and if there was a substantial condition to actual payment, such as being in the employ of the employer at the time of the scheduled vacation. In Rev. Rul. 54–608 the respondent relied in part upon *Tennessee Consolidated Coal Co., supra*, and *E. H. Sheldon & Co.* v. *Commissioner*, (C.A. 6) 214 F. 2d 655, affirming in part 19 T.C. 481, in revoking I.T. 3956 and holding that no accrual of vacation pay can take place until the fact of liability to a specific person has been clearly established and the amount of the liability to each individual is capable of computation with reasonable accuracy. While Rev. Rul. 54–608 does not specifically so state, it seems obvious that

the postponement of its applicability related only to those taxpayers who had theretofore chosen, pursuant to I.T. 3956, to accrue vacation pay in the year in which the qualifying services were rendered, and that it was not intended to continue I.T. 3956 in effect to permit taxpayers who were properly deducting vacation pay in the year paid to accrue such pay contrary to the principles of Rev. Rul. 54–608.[8] Section 3791(b) of the 1939 Code and section 7805(b) of the 1954 Code authorize limitation of only the *retroactive* effect of a ruling or regulation. Furthermore, it is clear from the legislative history of section 97 of the Technical Amendments Act of 1958 that such section did not purport to lay down a general rule for the accrual of vacation pay, but that it merely provides that deduction for accrued vacation pay shall not be denied solely by reason of the fact that liability therefor to a specific person has not been clearly established and the liability to each individual is not capable of computation with reasonable accuracy, if the taxpayer has consistently applied the principles of I.T. 3956 and deducted vacation pay in the year the qualifying services were rendered.[9]

The petitioner in the instant case did not, pursuant to I.T. 3956, adopt the practice of accruing vacation pay at the close of the taxable year in which the qualifying service was rendered. It had, since the vacation pay agreements were executed, consistently deducted the vacation pay in the year paid. It was not until December 1954 that the petitioner first set up an accrual for vacation pay in the year in which the qualifying service was rendered, and then such action was apparently not based on I.T. 3956 but upon section 462 of the Internal Revenue Code of 1954 (subsequently repealed), which provided for the deduction of a reasonable addition to a reserve for estimated expenses. Accordingly we see no basis for concluding that petitioner has any right, based upon a reliance upon I.T. 3956, to accrue and deduct in 1954 and 1955 vacation pay based upon services rendered in those years. And, as pointed out hereinabove, we are of the opinion

---

[8] Thus, in Rev. Rul. 58–340, 1958–2 C.B. 174, it is stated:

"Taxpayers employing the accrual method of accounting, who under I.T. 3956, C.B. 1949–1, 78, chose to continue to accrue and deduct vacation pay for the year in which paid must continue on that basis until they adopt completely vested vacation pay plans which meet the requirements of Revenue Ruling 54–608, C.B. 1954–2, 8. Accrual-method taxpayers who have been deducting vacation pay on a paid basis and who adopt completely vested vacation pay plans may deduct, in the taxable year in which they adopt such a plan, payments made during such taxable year under the old plan as well as vacation pay accrued at the end of such taxable year under the new vested plan. The extension of the effective date of Revenue Ruling 54–608, by Revenue Ruling 57–325, C.B. 1957–2, 302, merely operates to permit those taxpayers, who were properly accruing vacation pay under I.T. 3956, to continue on that basis and to permit them sufficient time to adopt a plan meeting the requirements of Revenue Ruling 54–608."

[9] Senate Report No. 1983, 85th Cong., 2d Sess. (pp. 111, 112, 250, and 251), states:

"In Revenue Ruling 54–608 (C.B. 1954–2, 8) the Internal Revenue Service reconsidered its previous rulings [including I.T. 3956] on vacation pay. This ruling held that no accrual of vacation pay could occur until the fate of liability with respect to specific employees was clearly established and the amount of the liability to each individual employee was capable of computation with reasonable accuracy. This ruling was initially

that it is not otherwise entitled to so accrue the vacation pay since in the years of rendition of qualifying service there remained substantial conditions precedent to the existence of a liability on the part of the petitioner to pay it.

Upon the issue of accrual of vacation pay we hold for the respondent.

### Reimbursement of Costs of Foreclosure on Utah Fuel Co. Stock.

The petitioner contends that the amounts of $300,000 and $927.92 which it claimed as deductions for 1954 and 1955, respectively, representing reimbursements of trustee fees, attorney fees, and other costs of the foreclosure on the Utah Fuel Co. stock, constitute proper deductions under section 162 of the Internal Revenue Code of 1954. That section provides that there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business.

The petitioner points out that the original mortgage indentures imposed a liability upon the debtor to make reimbursement of any costs of foreclosure on the Utah Fuel Co. stock. It contends that the bankruptcy court did not extinguish this liability but, rather, continued it; that the liability, therefore, did not originate in the bankruptcy court's order; and that hence the expenditure cannot be considered as a reorganization cost. It further contends that from its standpoint these expenditures were not of a capital nature, that it

made applicable to taxable years ending on or after June 30, 1955. It was then thought that taxpayers accruing vacation pay under plans which did not meet the requirements of the strict accrual rules set forth in this ruling would utilize section 462 of the 1954 Code. This section of the Code, however, has been repealed and the Treasury Department in a series of actions has continued to postpone the effective date of Revenue Ruling 54–608 until January 1, 1959 (the last postponement was made in Rev. Rul. 57–325, IRB 1957–27, 11, July 8, 1957). The Treasury Department recently announced in Revenue Ruling 58–340, Internal Revenue Bulletin 1958–28, page 19, that the postponement of the effective date of Revenue Ruling 54–608 applies only to those taxpayers who were properly accruing vacation pay under I.T. 3956. * * *

"Your committee has concluded that more time is required for study before Revenue Ruling 54–608 is made applicable to those taxpayers *who were properly accruing vacation pay under I.T. 3956.* Therefore, your committee has extended for 2 more years the period in which Revenue Ruling 54–608 is to be inapplicable with respect to such taxpayers. Thus, in section 102 the bill provides that in respect of such taxpayers deductions for accrued vacation pay are not to be denied for any taxable year ending before January 1, 1961, solely by reason of the fact that the liability for the vacation pay to a specific person has not been clearly established or that the amount of the liability to each individual is not capable of computation with reasonable accuracy.

\* \* \* \* \* \*

"*This section shall not apply unless the accrual for vacation pay is computed in accordance with the method of accounting consistently followed by the taxpayer in arriving at such deduction. This section is intended to apply only to those accrual method taxpayers who applied the principles of I.T. 3956 to deduct vacation pay in the year accrued, and who, since the publication of Revenue Ruling 54–608, have continued to compute the deduction in such manner. However, this section is not intended to limit or increase the deduction for vacation pay that would otherwise be allowable to those accrual method taxpayers who under I.T. 3956, have consistently computed the deduction for vacation pay in the year paid.*"
(Emphasis supplied.)

derived no benefit therefrom, and that if the respondent's position should be approved the result would be that the trustee's fees and expenses, which are normally deductible, could never be deducted by either the petitioner or its predecessor.

The respondent contends that such amounts are not ordinary and necessary expenses paid or incurred by the petitioner in carrying on its trade or business; that, on the contrary, the obligation to pay these amounts was one which the petitioner, as the reorganized company, was required to assume under the plan of reorganization; and that it was a cost of the reorganization and hence a nondeductible capital expenditure.

Whether and to what extent deductions shall be allowed depends upon legislative grace. Only if there is clear provision therefor can any particular deduction be allowed. A taxpayer seeking a deduction must be able to point to an applicable statute and show that he comes within its terms. *New Colonial Co.* v. *Helvering*, 292 U.S. 435. Not all necessary expenditures are deductible as ordinary and necessary business expenses. Many necessary payments are charges against capital and not deductible. *Welch* v. *Helvering*, 290 U.S. 111.

It is well established by decisions of this and other courts that expenditures relating to a recapitalization or reorganization of a corporation are not ordinary and necessary business expenses within the meaning of the statute. *Motion Picture Capital Corp.* v. *Commissioner*, (C.A. 2) 80 F. 2d 872; *Skenandoa Rayon Corp.* v. *Commissioner*, (C.A. 2) 122 F. 2d 268, affirming 42 B.T.A. 1287, certiorari denied 314 U.S. 696; *Missouri-Kansas Pipe Line Co.* v. *Commissioner*, (C.A. 3) 148 F. 2d 460, affirming a Memorandum Opinion of this Court; *Bush Terminal Buildings Co.* v. *Commissioner*, (C.A. 2) 204 F. 2d 575, affirming 17 T.C. 485, certiorari denied 346 U.S. 856; *Bush Terminal Buildings Co.*, 7 T.C. 793; *Odorono Co.*, 26 B.T.A. 1355; *Richard H. Survaunt*, 5 T.C. 665, affd. (C.A. 8) 162 F. 2d 753; *Denver & Salt Lake Railway Co.*, 24 T.C. 709, petition for review dismissed (C.A. 10); and *International Building Co.* v. *United States*, (E.D. Mo.) 97 F. Supp. 595, affirmed on this issue (C.A. 8) 199 F. 2d 12, reversed on another issue 345 U.S. 502. The cases generally hold that such expenditures are not "ordinary" in the conduct of business within the meaning of the statute. And we have held that an expenditure may not be deductible as a business expense even though the expenditure did not result in the acquisition of an asset the cost of which may be recovered by deductions for exhaustion thereof. *Bush Terminal Buildings Co.*, *supra*, and cases cited therein.

The petitioner contends that the above cases are not applicable under the circumstances of this case. It likens this case to *United States* v. *Minneapolis & St. Louis Railway Co.*, (C.A. 8) 260 F. 2d 663. The respondent contends that the case which most closely resembles the

578

instant case is *International Building Co.* v. *United States, supra,* and that such case requires a decision in his favor.

In *United States* v. *Minneapolis & St. Louis Railway Co., supra,* the taxpayer had acquired on December 1, 1943, all the assets and liabilities of a predecessor corporation in a sale under a foreclosure decree and plan of reorganization pursuant to a receivership of the predecessor. Under the foreclosure decree the taxpayer was required to assume and discharge all contracts made by the receiver. In 1942 railway labor organizations had served notice on railroads, including the predecessor corporation, demanding an increase in the wages of employees effective October 25, 1942. At December 1, 1943, no proposals had been accepted which gave rise to a liability of taxpayer's predecessor. It was not until January 17, 1944, after the Government took control of the railroads, that an agreement was reached giving the employees a wage increase retroactive to February 1, 1943. The taxpayer in its taxable year 1944 paid the retroactive wage increases for the period February 1, 1943, to November 30, 1943, which was the period prior to its taking over of the assets of the predecessor. Both the predecessor and the taxpayer made returns on an accrual method of accounting. The District Court held that the payment of the retroactive wage increase was properly deductible by the taxpayer in 1944. In so holding it found that the taxpayer had not agreed, as a cost of the predecessor's assets, to discharge any such liability, and that indeed no obligation had arisen while the predecessor held the assets.

The Court of Appeals for the Eighth Circuit affirmed the decision of the lower court, rejecting the Government's claim that the amount expended should be treated for tax purposes as part of the cost of acquiring the assets of the predecessor and hence a capital expenditure. The court pointed out that when in 1944 the wage dispute was settled the obligation assumed and paid by the railroads in that year became business expenses of that year. It concluded that the act of the taxpayer in agreeing to the wage settlement in 1944 created the liability to pay the retroactive wages, that the taxpayer was therefore paying its own debt and not any debt of the predecessor company or the receiver, and that the payment was a deductible expense of doing business in that year.

In *International Building Co.* v. *United States, supra,* an action had been instituted in 1941 for the foreclosure of $300,000 first mortgage bonds on the taxpayer's property. The taxpayer thereupon filed a petition in a United States District Court for a reorganization under the Bankruptcy Act in order to protect the property from foreclosure, and a reorganization was effectuated. The bankruptcy court allowed an amount of $6,360 as attorney fees to the attorneys for the bondholders, the attorney for the indenture trustee, and the indenture

trustee. The taxpayer claimed the amount of $6,360 as a deduction in its income tax return for the year 1944. The court held that the expenditure was not deductible, citing, among other cases, *Skenandoa Rayon Corp.* v. *Commissioner, supra.*

Upon a careful consideration of the contentions of the parties in the light of the facts involved, we are of the opinion that the position of the respondent is the correct one.

It is true that under the original indentures any expenses of foreclosure on the Utah Fuel Co. stock were to be borne by the debtor, and apparently were a lien upon its property; that the bankruptcy court did not discharge the obligation of the bonds insofar as they were a charge upon the Utah Fuel Co. stock; and that the foreclosure was effected in a separate proceeding in the Supreme Court of New York. However, as we read the bankruptcy court's consummation order and final decree, the debtor was discharged from all its debts and liabilities and its property was vested in the petitioner as the reorganized company free and clear of all claims, including any lien which might exist thereon for the payment of any foreclosure expenses with respect to the Utah Fuel Co. stock. In its order the bankruptcy court specifically provided that all compensation for services rendered and all expenses incurred by the trustees which would have been secured by the liens of the mortgages, if such mortgages had not been released, should be deemed to be expenses incurred in connection with the bankruptcy proceeding or the plan of reorganization. It specifically provided that the reorganized company should pay the trustees reasonable compensation for services rendered and reimbursement for expenses incurred, including attorney fees in adjudicating their claims, as trustees, against the stock of the Utah Fuel Co. It reserved jurisdiction to allow fees or compensation for services rendered and reimbursement for expenses theretofore or thereafter rendered or incurred in connection with the bankruptcy proceeding or the plan of reorganization. It reserved the right to determine, and did determine, what portion of the fees awarded by the Supreme Court of New York constituted reasonable fees for purposes of fixing the liability of the petitioner.

It thus seems clear that the bankruptcy court did not continue as a liability of the petitioner the original liability of the debtor under the mortgage indentures to pay the costs of foreclosure on the Utah Fuel Co. stock, but imposed the liability upon the petitioner as an expense in connection with the bankruptcy or the plan of reorganization. In this connection it is to be noted that the Court of Appeals pointed out that it was the purpose of the reorganization plan, which was accepted and approved, and of the consummation order and final decree, to relieve the trustees, and through them, the bondholders, of the foreclosure expense and to make the reorganized company, the petitioner,

primarily liable therefor. Also in this connection it is to be noted that in *R. F. C.* v. *Denver & R. G. W. R. Co.*, 328 U.S. 495, which involved this same bankruptcy reorganization, the Supreme Court pointed out that it was explicit in the reorganization plan that the trustee obtain the release of the equities in the Utah Fuel Co. stock.

In view of the foregoing, it seems to us that the foreclosure proceeding and the consequent liability of the petitioner for the costs thereof were so inextricably involved in the overall plan of reorganization that the amounts in question must be considered as costs of the reorganization, imposed upon the petitioner by the bankruptcy court. The liability for such foreclosure costs was not undertaken by the act of the petitioner as an ordinary expense in carrying on its business, as were the expenditures in the *Minneapolis & St. Louis Railway Co.* case. Rather, this was a cost of the reorganization by which the petitioner obtained the business and which, in the final analysis, served to reduce the amount of property or funds which it obtained in the reorganization, as did all other amounts which it was required to assume and pay.

Even if we were to concur in the view of the petitioner that the bankruptcy court did not extinguish the original liability on the part of the debtor to reimburse the costs of foreclosure on the Utah Fuel Co. stock, but continued such liability and caused the petitioner to assume it, we think there would still be no ground for holding that the petitioner is entitled to deduct, as ordinary and necessary expenses incurred by it in carrying on its business, the amounts which it was required to pay. As a prerequisite to a conclusion that the liability was paid or incurred by the petitioner as an incident to its business, it would have to be concluded that the petitioner was the same entity, after the reorganization, as the debtor prior thereto. The petitioner does not contend that this was so, and we think that the petitioner must be considered as a different entity from the debtor, despite the fact that it, as the reorganized corporation, utilized the charter of the debtor. The evidence before us does not include the terms of the charter before and after the reorganization, but such evidence as we have indicates that there were substantial modifications in the charter made in accordance with the requirements of the reorganization plan. Apparently the equity interest in the corporation was completely changed, and furthermore the petitioner apparently did not assume all the debts of the old corporation. See *Willingham* v. *United States*, (C.A. 5) 289 F. 2d 283, certiorari denied 368 U.S. 828, in which it was held, for purposes of the net operating loss carryover provisions, that a corporation emerging from a bankruptcy reorganization, even though there was uninterrupted corporate existence under the State charter, was a completely different corporate person and a new business enterprise, since it had entirely new stock ownership

with an entirely new corporate structure and its debts had been wiped out by the adoption of the plan of reorganization.

Furthermore, section 381(c)(16) of the Internal Revenue Code of 1954 sets forth the circumstances under which a corporation acquiring assets of another corporation and assuming an obligation of the transferor corporation shall be entitled to a deduction when it pays or accrues the item. Section 381, by its terms, applies only to tax-free transfers in connection with the types of reorganizations described in section 368(a)(1) of the Code. The reorganization here involved was not such a reorganization. It was a railroad reorganization in a proceeding under section 77 of the Bankruptcy Act. Section 373 of the Internal Revenue Code of 1954, which deals with such railroad reorganizations, does not provide for nonrecognition of gain upon the transfer of property in such a reorganization, but merely for nonrecognition of loss. We think it must be concluded that since section 381 specifies the particular situations in which an acquiring corporation is entitled to deduct items paid as a result of the assumption of obligations of the transferor corporation, other situations such as that involved here were intended not to give rise to a deduction by the acquiring corporation. This view is fortified by the congressional committee reports with respect to section 381, which indicate that in view of the uncertainty and frequently contradictory existing court-made law, the purpose in enacting section 381 was to set forth definite provisions for the future, based upon economic realities rather than upon the legal form of the reorganization. See H. Rept. No. 1337, 83d Cong., 2d Sess., p. 41, and S. Rept. No. 1622, 83d Cong., 2d Sess., p. 52. And in the Summary of the New Provisions of the Internal Revenue Code of 1954, prepared by the staff of the Joint Committee on Internal Revenue Taxation, it is specifically stated with respect to the provisions of section 381 that "Carryovers do not apply to acquisitions of corporate assets in the case of other reorganizations * * *." See also sec. 1.381(a)–1(b), Income Tax Regs.

The petitioner contends that in any event $40,000, representing the amount which the bankruptcy court ordered to be paid to the attorneys for the principal bondholder for services in the bankruptcy court in connection with the claim of the bondholders for reimbursement, should be considered as a deductible expense.

It is the petitioner's position that normally attorneys' fees incurred in litigation in the course of business constitute business expenses. However, the petitioner's argument overlooks the fact that this $40,000 was merely a portion of the $300,000 awarded by the bankruptcy court as reimbursement of costs of the foreclosure on the Utah Fuel Co. stock. The $40,000 did not represent the payment by the petitioner of attorney fees, as such, within the rule contemplated by the petitioner.

It is our conclusion that no part of the $300,000 constituted an ordinary and necessary business expense of the petitioner.

For the reasons stated above with respect to the $300,000 item, we also conclude that the petitioner is not entitled to deduct the amount of $927.92 which it paid in 1955 in reimbursement of the trustee's cost of distribution.

We hold that the respondent did not err in disallowing the respective amounts of $300,000 and $927.92 claimed by the petitioner as deductions for the taxable years 1954 and 1955.

## *Contribution of $1,000.*

Petitioner contends that the $1,000 contribution paid to the Salt Lake City Chamber of Commerce for the use of Backman and Clyde in their program to promote the construction of the Echo Park dam is deductible as an ordinary and necessary business expense under section 162(a) of the Internal Revenue Code of 1954. The respondent contends that this contribution was made for the promotion of legislation and for lobbying purposes and therefore is not deductible because it falls within the scope of section 1.162–15(c) of the Income Tax Regulations.[10] The quoted provision of that regulation was promulgated on December 28, 1959, T.D. 6435, 1960–1 C.B. 79, and is applicable to all years covered by the 1954 Code. During the interim before its promulgation, the corresponding, but less detailed, regulations under the 1939 Code were continued in effect by T.D. 6091, 1954–2 C.B. 47, and were applicable to section 162(a) of the 1954 Code. In *Textile Mills Securities Corporation* v. *Commissioner*, 314 U.S. 326, and in *Cammarano* v. *United States*, 358 U.S. 498, the Supreme Court approved the similar provisions of the corresponding regulations under the 1939 Code and prior revenue acts, even though they were not specifically incorporated under the business expense section. See *Alex H. Washburn*, 33 T.C. 1003, affd. (C.A. 8) 283 F. 2d 839, certiorari denied. 365 U.S. 844.

---

[10] Section 1.162–15(c) of the regulations provides, in part, as follows:

(1) Expenditures for lobbying purposes, for the promotion or defeat of legislation, for political campaign purposes (including the support of or opposition to any candidate for public office), or for carrying on propaganda (including advertising) related to any of the foregoing purposes are not deductible from gross income. For example, the cost of advertising to promote or defeat legislation or to influence the public with respect to the desirability or undesirability of proposed legislation is not deductible as a business expense, even though the legislation may directly affect the taxpayer's business. * * *

\*        *        *        *        *        *        *

(3) Expenditures for the promotion or defeat of legislation include, but shall not be limited to, expenditures for the purpose of attempting to—

(i) Influence members of a legislative body directly or indirectly, by urging or encouraging the public to contact such members for the purpose of proposing, supporting, or opposing legislation, or

(ii) Influence the public to approve or reject a measure in a referendum, initiative, vote on a constitutional amendment, or similar procedure.

We think there can be no question, under the facts shown, that the contribution of $1,000 was for the purpose of lobbying or for the promotion of legislation which was necessary as a prerequisite to the authorization of the Echo Park project, or for carrying on propaganda related to the promotion of such legislation. The petitioner was aware of the purposes to which the fund was to be put. As pointed out in our Findings of Fact, the money was used for the purpose of gaining support for the passage of Federal legislation through the payment of expenses of witnesses who appeared before congressional committees, some of whom directly contacted Congressmen, the payment of expenses of persons who contacted individuals and groups throughout the country, and the payment of costs of printing articles and brochures. In his testimony Backman conceded that the whole purpose of the program was to remove opposition to the project and to gain support for and influence the passage of legislation authorizing the project. The fact that the petitioner could reasonably expect some financial benefits from the construction of the dam does not alter the conclusions reached above. See sec. 1.162–15(c)(1) of the regulations, and *Cammarano* v. *United States, supra.* Nor is the question of deductibility affected by such considerations as whether the proposed legislation might be considered in the public interest, as intimated by the petitioner on brief.

The respondent did not err in disallowing the claimed deduction of $1,000.

### Contribution of Locomotive.

The petitioner contends that the contribution of the narrow gage locomotive to the Gunnison Pioneer Association is deductible under section 170 of the Internal Revenue Code of 1954 [11] as a charitable contribution for the use of the City of Gunnison.[12] Respondent contends that the contribution of the locomotive is not deductible because it was not made "for the use of" the City of Gunnison.

The words "for the use of," as used in section 170(c) of the Code, are intended to convey a meaning similar to that of "in trust for." *John Danz*, 18 T.C. 454, affd. (C.A. 9) 231 F. 2d 673, certiorari denied 352 U.S. 828; *Muzaffer ErSelcuk*, 30 T.C. 962. The donee or trust

---

[11] Section 170 provides, in pertinent part, as follows:

(a) ALLOWANCE OF DEDUCTION.—

(1) GENERAL RULE.—There shall be allowed as a deduction any charitable contribution (as defined in subsection (c)) payment of which is made within the taxable year. * * *

\* \* \* \* \*, \* \*

(c) CHARITABLE CONTRIBUTION DEFINED.—For purposes of this section, the term "charitable contribution" means a contribution or gift to or for the use of—

(1) A State, a Territory, a possession of the United States, or any political subdivision of any of the foregoing, or the United States or the District of Columbia, but only if the contribution or gift is made for exclusively public purposes.

[12] Petitioner does not contend that the Pioneer Association, the actual donee, is an organization described in section 170(c) of the Code.

to which the contribution is made does not need to qualify as an exempt organization, so long as the contribution is "for the use of" an organization, entity, or charity qualifying under section 170(c). See *John Danz, supra.* The trust may be created orally. See *Pierce Estates, Inc.*, 3 T.C. 875.

The City of Gunnison is clearly an entity described in section 170(c)(1). However, the respondent contends that the proof does not establish that the petitioner transferred the locomotive to the Pioneer Association in trust for the City of Gunnison. On the contrary, he contends that the evidence indicates that there was merely a transfer to the association and that there was then an agreement between the association and the city for the display of the locomotive in the city park. Such contention is apparently based on a letter addressed on May 6, 1958, to the petitioner by the city clerk of Gunnison and the president of the association in which it is stated that the locomotive was donated to the Pioneer Association and that when the donation was made there were no restrictions placed on the donation by the petitioner. The evidence does not show why the city and the association wrote this letter. However, the same letter also recognizes that when the donation was made in 1955 the city was a party to the agreement, as well as the petitioner and the Pioneer Association. In addition, Carlton T. Sills, who had been in the public relations department of the petitioner at the time of the donation, testified that the people of Gunnison wanted this particular locomotive as a reminder of Gunnison's past glory as a railroad center, that the city agreed to put the locomotive on display in its public park, and that the Pioneer Association was a party because its members agreed that they would assume the responsibility of taking care of the locomotive. He testified in effect that it was the purpose of the petitioner, and the understanding reached, that the locomotive was to be displayed at a place where it would be to the benefit of the Gunnison community and to the public generally. The locomotive was actually placed in a city park and has since remained there on public display except for the period in 1959 when the petitioner borrowed it for exhibit for the Denver Centennial Exhibition. Sills testified that in order for the petitioner to borrow the engine it was necessary to obtain the joint concurrence of the City of Gunnison and the Pioneer Association.

Based upon the evidence as a whole, we are satisfied that the agreement in 1955 among the petitioner, the Pioneer Association, and the City of Gunnison created a trust relationship whereby the association held the locomotive in trust for the use of the City of Gunnison for exclusively public purposes. We think that under the agreement the association would be precluded from disposing of the locomotive or using it for any other purpose.

We hold that the petitioner is entitled to a deduction for the taxable year 1955 in the amount of $6,000 on account of the contribution of the locomotive.

*Decision will be entered under Rule 50.*