108 T.C. No. 12

UNITED STATES TAX COURT

AMERICAN STORES COMPANY AND SUBSIDIARIES, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 19182-94.                    Filed March 31, 1997.

        P made contractually required monthly
contributions to 39 multiemployer pension plans.  P
also provided vacation pay benefits to its employees
under various plans.  For its TYE Jan. 31, 1987 (8701),
P obtained an extension of the time within which to
file its U.S. consolidated corporate income tax return
to Oct. 15, 1987.  For its TYE Jan. 30, 1988 (8801), P
obtained an extension of the time within which to file
its U.S. consolidated corporate income tax return to
Oct. 17, 1988.  On its return for TYE 8801 P deducted,
in addition to the 12 monthly contributions based on
units of service worked during the taxable year,
contributions based on units of service worked during
months after the last day of TYE 8801 but before the
due date of the return as extended.  On its returns for
TYE 8701 and TYE 8801 P also deducted, in addition to
its vacation pay liabilities based on units of service
worked during those years, vacation pay liabilities
based on units of service worked during months after

the last days of the taxable years but before the due dates of the returns as extended.

    1. Held:  pension contributions, based on units of service worked after the close of TYE 8801 and before Oct. 17, 1988, were not on account of P's TYE 8801, as required by sec. 404(a)(6), I.R.C., and are therefore not deductible in that year.  Lucky Stores, Inc., & Subs. v. Commissioner, 107 T.C. 1 (1996), supplemented by T.C. Memo. 1997-70, followed.

    2. Held, further, vacation pay, based on units of service worked after the close of TYE 8701 or TYE 8801 and before the due date of the return for such year as extended, was not earned in TYE 8701 or TYE 8801, as required by sec. 463(a)(1), I.R.C., and is therefore not deductible in such year.


Frederick J. Gerhart, Thomas E. Doran, Stephen DiBonaventura, and Scott D. Price, for petitioner.

Thomas R. Lamons, C. Glenn McLoughlin, and David L. Miller, for respondent.


OPINION

NIMS, Judge:  Respondent determined the following deficiencies in petitioner's Federal income tax:

| Taxable year ending (TYE) | Deficiency |
| --- | --- |
| February 2, 1985 | $3,704,320 |
| February 1, 1986 | 726,452 |
| January 31, 1987 | 43,266,274 |
| January 30, 1988 | 29,480,791 |

Unless otherwise indicated, all section references are to sections of the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions, the following 2 issues remain for us to resolve in the present proceeding:  (1) Whether petitioner, in its taxable year ending January 30, 1988 (TYE 8801), properly deducted certain contributions to multiemployer pension plans attributable to services performed after the conclusion of that tax year, and (2) whether petitioner properly deducted certain vacation pay liabilities pursuant to section 463 in its taxable year ended January 31, 1987 (TYE 8701) and in TYE 8801.  The amount of the disputed pension contribution deduction is $37,839,040.20.  The amounts of the disputed vacation pay deductions are $24,171,499 in TYE 8701 and $17,927,808 in TYE 8801.

The facts have been fully stipulated and are found accordingly.  This reference incorporates the stipulated facts and attached exhibits.

Petitioner is a Delaware corporation.  At the time the petition was filed, petitioner's principal place of business was located in Salt Lake City, Utah.

## Background

Petitioner is the common parent of an affiliated group of corporations, and files a consolidated Federal income tax return annually.  Petitioner filed the petition on behalf of all eligible members of the group.  For Federal income tax purposes, petitioner elected to file corporate income tax returns on the basis of a 52-53 week fiscal year ending on the Saturday nearest

January 31 of any given year.  Petitioner requested and received an extension to October 15, 1987, to file its United States consolidated corporate income tax return for TYE 8701.  Petitioner requested and received an extension to October 17, 1988, to file its United States consolidated corporate income tax return for TYE 8801.

Petitioner, through its subsidiaries, primarily engages in the retail sale of food and drug merchandise.  Conjointly, the subsidiaries represent one of the nation's leading retailers, operating combination drug/food stores, super drug centers, drug stores and food stores.  During the years in question, petitioner conducted its principal business activities through wholly owned subsidiaries and operating divisions, including:  Acme Markets, Inc., Jewel Food Stores, Star Market, Jewel OSCO, Alpha Beta Company, Skaggs Alpha Beta, and Buttrey Food.

Respondent issued a statutory notice of deficiency on July 26, 1994.  After stipulations of agreement executed by the parties, the remaining issues are:  (1) Whether petitioner can deduct in TYE 8801 certain contributions made to various multiemployer pension plans in the months after January 30, 1988, but before the extended due date for filing its return, and (2) whether petitioner is entitled to certain vacation pay accrual adjustments pursuant to section 463 for TYE 8701 and TYE 8801.

## I. The Deductions for Contributions to Collectively Bargained Plans

Under applicable Internal Revenue Code provisions, employers may enter into "qualified" deferred compensation arrangements, which provide retirement and other benefits to employees and their beneficiaries through single employer plans, multiple employer plans, and multiemployer plans. Plans not established pursuant to collective bargaining agreements are herein referred to as Multiple Employer Plans. Plans established and maintained pursuant to such agreements are henceforth referred to as Multiemployer Plans or, alternately, as CBA Plans. In both Multiple Employer Plans and Multiemployer Plans, the contributions of participating employers are pooled and used to provide benefits to all covered employees, former employees, and their beneficiaries. Section 413(b) contains certain rules exclusively applicable to CBA Plans, which are the plans involved in the instant case.

At all relevant times, petitioner was obligated to contribute money to 39 CBA Plans. These plans were defined benefit pension plans. By stipulation of the parties, arguments were limited to the 10 plans to which petitioner contributed the largest amounts in TYE 8801 (the Top 10 Plans). The parties have agreed to apply the Court's decision with respect to the Top 10 Plans to petitioner's contributions to the other 29 plans. The

following schedule sets forth the the Top 10 Plans and their respective annual accounting periods (plan years) for Federal tax purposes:

| CBA Plan | Plan Year |
|---|---|
| Southern California UFCW Union & Food Employers Joint Pension Trust Fund | April 1 - March 31 |
| UFCW Union and Participating Food Industry Employers Tri-State Pension Fund | January 1 - December 31 |
| Northern California Retail Clerk Union & Food Employers Joint Pension Trust Fund | January 1 - December 31 |
| Southern California Meat Cutters Union & Food Employers Pension Trust Fund | July 1 - June 30 |
| UFCW Union Local 56 Retail Meat Pension Fund | July 1 - June 30 |
| UFCW International Union Industry Pension Fund | July 1 - June 30 |
| Western Conference of Teamsters Pension Trust | January 1 - December 31 |
| Southern California Retail Clerks Union & Drug Employers Pension Fund | January 1 - December 31 |
| Warehouse Employees Union Local 169 & Employers Joint Pension Fund | January 1 - December 31 |
| UFCW Local 72 & Participating Employers Pension Fund | January 1 - December 31 |

During the calendar years 1986, 1987, and 1988, more than 1,000 employers made contributions on behalf of thousands of unionized employees and their beneficiaries to many of the plans. Other plans were smaller. At all times between January 1, 1986

and December 31, 1988, each of the plans qualified as a Multiemployer Plan within the meaning of the Employee Retirement Income Security Act of 1974 (ERISA), Pub. L. 93-406, 88 Stat. 829 and was a plan to which section 413(b) and Subtitle E of Title IV of ERISA applied. Moreover, at all times during this period, each of the plans qualified under section 401(a) as a pension plan, and, accordingly, the trusts related to each CBA Plan were exempt from taxation under section 501.

Generally, at the end of each month, petitioner calculated the amount of its required contribution to each CBA Plan by multiplying the hours or weeks (units of service) worked by covered employees in such month by fixed monetary rates (the contribution rate) set by the collective bargaining agreement. Increases or decreases in the number of covered employees, along with increases or decreases in the units of service worked by covered employees, required petitioner to make a separate calculation for its required contribution to each plan every month. Contributions to each CBA Plan attributable to units of service worked in a given month were due on the 30th of the month after the units of service were worked. On occasion, contributions to plans were made on a quarterly basis, based upon covered services performed during the quarter.

For taxable years prior to TYE 8801, petitioner's subsidiaries computed their deductions for plan contributions in one of 2 ways. Skaggs Alpha Beta and Jewel Food Stores (for one of the plans to which it contributed) calculated the contributions paid to the plans during the corporations' taxable years (regardless of when the covered services related to the contributions were performed) and claimed that total as their deduction. Alpha Beta Company, Osco Drug Company, Acme Markets, and Jewel Food Stores (for the other plans to which it contributed) calculated the contributions related to covered services performed during their taxable years (regardless of when those contributions were paid) and claimed that total as their deduction. For each subsidiary, and for each taxable year ending prior to petitioner's TYE 8801, the total amount claimed as a deduction for that year did not include any contributions attributable to covered services performed after the end of that taxable year.

For TYE 8801, Skaggs Alpha Beta (for the plans to which it contributed) and Jewel Food Stores (for one of the plans to which it contributed) computed their deductions for contributions to the plans claimed on petitioner's Federal income tax returns by adding together the contributions actually made during TYE 8801 and those contributions made after the end of TYE 8801, but

before the due date for filing petitioner's return (i.e., October 17, 1988). Jewel Food Stores calculated its deduction for contributions to 2 other plans by adding together contributions calculated with reference to covered services performed in TYE 8801 and those contributions calculated with reference to covered services performed after TYE 8801 that were made before the due date for filing petitioner's return. Alpha Beta Company, Osco Drug Company, and Acme Stores each calculated its deduction for contributions to the plans by adding together the contributions made with reference to covered services performed in TYE 8801 and those contributions which were related to covered services performed after TYE 8801 and were made after the end of TYE 8801 but before the due date for filing petitioner's return. Petitioner claimed a deduction for contributions to the plans of $101,787,413. Of that amount, $57,607,463 was reflected on petitioner's books as a TYE 8801 expense, and $44,179,950 was reflected on Schedule M-1 as an adjustment to petitioner's book income.

Of the $44,179,950 deducted by petitioner on the Schedule M-1, $116,285 pertained to amounts contributed by Skaggs Alpha Beta and Star Markets in February 1988 (and thus was attributable to covered services performed during TYE 8801). The remaining

$44,063,665 deducted by petitioner on Schedule M-1 related to covered services performed after the end of TYE 8801.

For taxable years after TYE 8801, petitioner reported deductions based upon contributions attributable to covered services performed during the taxable year (but not previously deducted for tax purposes), as well as contributions attributable to covered services performed after the close of the taxable year, where the contributions were made before the filing date for petitioner's Federal income tax return. In contrast to TYE 8801, for taxable years before and after TYE 8801, petitioner deducted only contributions calculated with reference to covered services performed over a 12-month period. At no time did petitioner file a Form 3115 (Application for Change in Accounting Method) concerning the method used to arrive at its deduction for contributions to the plans claimed on its return for TYE 8801.

In her notice of deficiency, respondent disallowed the $44,179,950 Schedule M-1 adjustment upon determining that petitioner could not properly deduct contributions attributable to covered services performed after the close of the taxable year as so-called grace period contributions. Respondent did not disallow the $57,607,463 deduction representing contributions made by petitioner to the plans attributable to covered services performed during TYE 8801.

The parties subsequently agreed that petitioner improperly calculated the amount of the "grace period contributions". Petitioner admits that it overstated its deduction for "grace period contributions" by $6,224,901.16, and acquiesces in the adjustments made by respondent to that extent. Thus, after that concession, the amount remaining in dispute in regard to contributions made by petitioner after January 30, 1988, and before October 15, 1988, was $37,955,325.20. Respondent concedes that contributions in the amount of $116,285 (which were attributable to amounts contributed by Skaggs Alpha Beta and Star Markets in February 1988 for covered services performed in January 1988) were properly deductible. As a result, the portion of the "grace period contributions" remaining at issue is $37,839,040.20.

The administrator of each plan was a party independent of petitioner and was appointed by the Board of Trustees of the plan. Under the terms of the collective bargaining agreements, the plans were entitled to collect interest and/or late fees on delinquent contributions from employers. At all times during the relevant period, each CBA Plan administrator had procedures to monitor the actual dates of receipt of each employer's required contribution.

As required by ERISA sections 104 and 4065, 88 Stat. 847, 1032, and sections 6057(b) and 6058(a), after the close of each plan year the administrator of each CBA Plan filed Annual Reports (Forms 5500) and accompanying schedules with the IRS. On Schedule B of Form 5500, each CBA Plan reported for its plan year only those contributions paid under the applicable agreement for units of service worked during that particular year. Only a defined benefit plan subject to the minimum funding standards of section 412 and ERISA section 302, 88 Stat. 869, is required to file a Schedule B. One purpose of the completion of the Schedule B is to demonstrate compliance or noncompliance with such minimum funding standards. At all times during the relevant periods, each CBA Plan satisfied the minimum funding requirements of section 412 and ERISA section 302. Petitioner's subsidiaries' monthly contributions to each CBA Plan were reported on Schedule B for that plan year in which the related units of service of the covered employees had been worked.

While nothing in the collective bargaining agreements prohibited petitioner from contributing more than the amount required, or contributing amounts in advance of the date that such amounts became due, no provision explained how the plan administrator should credit an advance contribution from an employer. Generally, advance pension contributions were not made

to the plans and, with the exception of advance contributions made with respect to vacation time and severance pay, petitioner did not make any such contributions during the taxable years at issue.  No contributions were made by petitioner to any of the CBA Plans during the relevant period that were not required by collective bargaining agreements.

Petitioner's subsidiaries, for public financial reporting purposes, accounted for their contributions to the CBA Plans in one of 2 ways.  Skaggs Alpha Beta (for the plans to which it contributed) and Jewel Food Stores (for one of the plans to which it contributed) calculated contributions paid to the plans during the corporations' taxable years (regardless of when the covered services related to the contributions were performed) and included that total as their contributions expense.  For the other plans to which Jewel Food Stores contributed, and for the plans to which Alpha Beta Company, Osco Drug Company, and Acme Markets contributed, the contributions related to covered services performed during the corporations' taxable years were treated as contributions expenses (regardless of when those contributions were paid).  For each of the subsidiaries, and for each taxable year, the amount included as a contributions expense did not include contributions attributable to covered services performed after the end of the taxable year.

The taxable year of a contributing employer need not match the plan year of a plan to which such employer contributes. Administrators of Multiemployer Plans are not cognizant of the taxable years adopted by contributing employers. Moreover, under the terms of the collective bargaining agreements, petitioner was not required to report to the plan administrators the deductions it claimed for contributions.

In preparing its funding standard account under section 412 for each plan year, no CBA Plan considered contributions made by contributing employers for hours worked by covered employees following such plan year. Under each CBA Plan for all relevant periods, the earning, crediting, and vesting of a participant's benefit remained independent of the making of any specific contribution of an employer.

The parties stipulated that, if called to testify by petitioner, the employee of petitioner most familiar with its subsidiaries' contribution obligations to each of the plans would state that, as of January 31, 1988, he had no reason to believe that the amount of any of the subsidiaries' monthly contribution obligation to any such plan would significantly decrease in the 8-month period following January 31, 1988. Furthermore, the amount of total employer contributions actually paid to each of the plans relating to covered services performed during each plan

year is an amount which the plan administrator could have, as of the beginning of such plan year, reasonably anticipated to be made by employers with respect to covered services performed during such plan year.

Petitioner consulted with an accounting firm, Ernst & Whinney, about accelerating deductions for contributions to the CBA Plans made after the end of a tax year and before the due date of the tax return for that year (herein for convenience referred to as grace period contributions). The parties stipulated that Ernst & Whinney marketed this type of acceleration to certain clients that were making required contributions to multiemployer defined benefit pension plans during this period.

Petitioner was never notified by any plan representative that the statutory deduction limit was exceeded with respect to any plan for any relevant period. Petitioner did not notify any plan representative that the monthly contributions calculated with reference to covered services performed after January 31, 1988, were to be applied to months ending on or before January 31, 1988.

## II.  The Vacation Pay Deductions

Petitioner provides many of its approximately 130,000 employees with job-related benefits, including vacation pay and

other types of compensated leave.  A number of factors determine the type and amount of vacation pay available to an employee, such as:  (1) The employing company; (2) the employee's job classification; (3) the employee's tenure with the employing company; and (4) the employee's status as a union or non-union worker.

Petitioner deducted $78,110,485 attributable to its vacation pay liability on its return for TYE 8701, $24,171,499 of which is in dispute in the instant case (the 1987 Vacation Pay). Petitioner deducted $62,841,617 attributable to its vacation pay liability on its return for TYE 8801, $17,927,808 of which remains in dispute (the 1988 Vacation Pay).

A.  The Terms of the Vacation Benefits Plans

Petitioner provided vacation pay benefits to its employees under three basic plans:  (1) The American Stores Co. general vacation plan and other plans providing similar benefits (herein collectively referred to as the General Plan); (2) the Star Markets Non-Union Plan (the Star Markets Plan); and (3) the Acme Markets Union Plans (the Acme Markets Plans).

1.  The General Plan

The General Plan is the vacation benefit plan most widely used by petitioner.  Under this plan, once a covered employee reaches the first anniversary of his initial hire date, he has

the right to take one week of paid vacation.  Following an employee's first year of continuous service, the plan operates somewhat differently.  As of each January 1, an employee's vacation pay benefits are determined based on the next anniversary of his initial hire date.  This calculated amount is referred to as the employee's "leave entitlement".  Only those individuals continuously employed by petitioner for the 12-month period ending on December 31 of each year obtain a leave entitlement.  The General Plan permits an employee to take his entire leave entitlement as of January 1.  Thus, for example, an employee who worked for petitioner since July 1, 1985, had the right to take 1 week of vacation upon reaching July 1, 1986.  On January 1, 1987, the same employee was able to take 2 weeks of leave, since the employee was expected to have 2 years of service by July 1, 1987.

The following schedule reflects the leave entitlement available to employees under the General Plan:

<u>Salaried</u>

    1 week after 1 year of service
    2 weeks after 2 years of service
    3 weeks after 5 years of service
    4 weeks after 10 years of service
    5 weeks after 20 years of service

<u>Hourly</u>

    1 week after 1 year of service
    2 weeks after 2 years of service

                    3 weeks after 5 years of service
                    4 weeks after 12 years of service
                    5 weeks after 20 years of service

The General Plan calculates years of service using the
anniversary of an employee's date of hire (the anniversary date).
The plan uses an employee's job category (salaried or hourly
worker) as of January 1 of each year to calculate the amount of
the employee's leave entitlement for the calendar year.  Leave
entitlements generally must be used by the end of the calendar
year; no full week increments of leave may extend beyond that
time.  Moreover, employees do not receive compensation for the
portion of their leave entitlement which remains unused at the
end of the calendar year.

     Leave entitlement for employees covered by the General Plan
vests ratably over the 1-year period between successive
anniversary dates.  Consequently, an employee's leave entitlement
as of January 1 normally includes both vested and nonvested
portions.  The vested portion is coextensive with services which
have already been performed by the employee.  The nonvested
portion of the leave entitlement will vest (on a weekly or
monthly basis) as future services are performed by the employee.
Thus, an employee with an anniversary date of July 1 of a given
year will be vested in one-half of his vacation pay for that year

as of January 1.  The other half of the leave entitlement will be nonvested at that time.

Although the General Plan enables a covered employee to take his entire leave entitlement anytime after January 1, if an employee leaves his job prior to reaching his anniversary date, he must reimburse petitioner for any used portion of the nonvested leave entitlement.  Moreover, if a covered employee retires or voluntarily terminates employment with unused leave entitlement, petitioner will only pay the employee for the vested leave entitlement.  The employee does not have a right to receive payment for any unused nonvested leave entitlement.

An employee receives vacation pay under the General Plan equal to the salary he would normally receive when the vacation is actually taken.  Vacation pay is not based on the employee's salary at the beginning of the calendar year.

2.  <u>The Star Markets Plan</u>

Star Markets provides vacation pay benefits to certain non-union employees under a plan which differs from the General Plan. Star Markets permits an employee to take 1 week of vacation after 1 year of continuous service, and 2 weeks of vacation after 2 years of continuous service.  The plan also permits employees with 5 years or more of continuous service to take additional vacation pay benefits.  The actual amount of vacation for which

an employee qualifies hinges on the employee's anniversary date with Star Markets. The following shows the vacation schedule for employees who qualify for 1 week of vacation under the Star Markets Plan:

| If Anniversary Date falls between: | Vacation may be taken between: |
|---|---|
| January 1 & April 30 | May 1 & October 31 |
| May 1 & December 31 | Upon reaching Anniversary |

The Star Markets Plan permits an employee on the payroll as of April 30 to take 2 weeks of vacation after completing 2 years of continuous service with Star Markets. The following shows the vacation schedule for employees who qualify for 2 weeks of vacation under the Star Markets Plan:

| If Anniversary Date falls between: | Vacation may be taken between: |
|---|---|
| January 1 & April 30 | May 1 & October 31 |
| May 1 & December 31 | First Week: Between May 1 & October 31 Second Week: Upon reaching Anniversary |

The parties have stipulated that, by the end of TYE 8701 and TYE 8801, employees satisfied three-quarters of the service necessary under the Star Markets Plan to qualify for 1 or 2 weeks of vacation, regardless of their respective anniversary dates. That is to say, the parties have stipulated that all employees were on the payroll as of April 30. The three-quarters of the

service satisfied (the 9-month span from May 1 to January 30 or 31) corresponds to an employee's "accumulated benefits" since, contrary to the General Plan, vacation benefits do not vest ratably under the Star Markets Plan. (Nonaccumulated benefits consist of that one-quarter of the vacation entitlement measured from the end of the relevant tax year (January 30 or 31) to the applicable date of grant (April 30).)

For employees who qualify for 1 or 2 weeks of vacation pay, the Star Markets Plan vacation season extends from May 1 through December 31 of each year. Unless an individual terminates employment prior to reaching his anniversary date, he becomes fully vested in the first and second weeks of vacation as of the date he is eligible to take his vacation under the plan (with the exception of an employee starting between May 1 and December 31, who can take his first week between May 1 and October 31, but does not vest until his anniversary date).

All vacation under the Star Markets Plan must commence within the calendar year in which an employee reaches his anniversary date with Star Markets. No vacation benefits may be accumulated from year to year. (The record does not disclose how an employee whose anniversary date falls in the last week of December is supposed to take his vacation. We presume that, as long as his vacation commences before the end of that calendar

year, it may continue into the next calendar year without forfeiture.)  As with the General Plan, the Star Markets Plan calculates vacation pay benefits using an employee's rate of pay in effect at the time the vacation is actually taken; vacation pay is not premised on an employee's salary at the beginning of the calendar year.

### 3. The Acme Markets Plans

Acme Markets offers vacation pay benefits to certain union employees.  The Acme Markets Plans' vacation season extends from May 1 through September 30 of each year for the first and second weeks of vacation, and May 1 through April 30 of the next calendar year for the third, fourth, and fifth weeks of vacation. In contrast with the Star Markets Plan, employees covered by the Acme Markets Plans vest ratably in a specified amount of leave for each month or each week they work for Acme Markets between May 1 of one calendar year and April 30 of the next year.  The amount of leave in which an employee vests depends on the employee's length of continuous service with Acme Markets.  As of May 1 of each year, an employee will be fully vested in the vacation pay he is expected to take during the vacation season beginning on that date.

All vacations under the Acme Markets Plans must be used during the relevant vacation season; no vacation benefits accrue

from one vacation season to the next. A covered employee who terminates employment before reaching the May 1 start of a vacation season retains the right to receive payment for vacation pay benefits he has vested in since May 1 of the preceding year. However, he has no right to receive vacation pay for nonvested vacation benefits he would have vested in by the May 1 start of the next vacation season. An employee receives vacation pay under the Acme Markets plan equal to the salary he would normally receive when the vacation is actually taken.

B. Petitioner's Section 463 Deductions

For the General Plan and the Acme Markets Plans, petitioner included both the unused yearend vested and nonvested vacation benefits in calculating its vacation pay accruals under section 463 for the relevant period. In some instances, petitioner applied inflation factor adjustments to the unused yearend vested and nonvested vacation benefits when calculating claimed accruals under section 463. The parties agree that petitioner may include the unused yearend vested vacation benefits and related adjustments when calculating its vacation pay accruals under section 463. Respondent disputes, however, petitioner's inclusion of the unused yearend nonvested vacation benefits and adjustments when calculating the vacation pay accruals under section 463 for TYE 8701 and TYE 8801.

Petitioner also included the yearend Star Markets accumulated and nonaccumulated benefits when calculating the claimed vacation pay accruals under section 463 for the relevant period. Star Markets also applied inflation factor adjustments to the yearend accumulated and nonaccumulated benefits when calculating the claimed vacation pay accruals under section 463. The parties agree that Star Markets may include the yearend accumulated benefits and corresponding adjustments when calculating its vacation pay accruals under section 463. However, respondent disputes the inclusion of the nonaccumulated benefits and adjustments when calculating accruals for TYE 8701 and TYE 8801.

## Discussion

The issues we must decide are: (1) Whether petitioner properly deducted contributions made to Multiemployer Plans attributable to services performed after TYE 8801 on its return for that year; and (2) whether petitioner properly deducted certain nonvested or nonaccumulated vacation pay liabilities pursuant to section 463 on its returns for TYE 8701 and TYE 8801. For the following reasons, we hold that the timing of petitioner's deductions was improper with respect to both issues.

Issue 1.  The Deductions for Grace Period Contributions to Multiemployer Plans

During the relevant period, petitioner's subsidiaries made monthly contributions to 39 CBA Plans on behalf of their unionized employees. For each CBA Plan, the amount of the monthly contribution was obtained by multiplying the units of service worked by employees covered under the respective CBA Plan by the contribution rate.

For each taxable year prior to TYE 8801, petitioner deducted 12 monthly contributions based on covered hours worked during such year. Then, as to TYE 8801, petitioner changed its method of calculating its deduction. For that year, petitioner obtained an extension to October 17, 1988, of the time within which to file its return. Between the date on which TYE 8801 ended and the extended due date of the return, petitioner's subsidiaries made 7 or in some cases 8 monthly contributions to the CBA Plans, and claimed these grace period contributions as a deduction for TYE 8801, in addition to the 12 monthly contributions.

Section 404(a) specifies that employer contributions to exempt trusts under various types of qualified employee benefit plans are not deductible under any other Code provision, but if they would otherwise be deductible, they are deductible under section 404, subject to articulated limitations as to the amount deductible in any taxable year. The limitations on the amount deductible are contained in section 404(a)(1)(A), which also

refers to the deduction of contributions "In the taxable year when paid".  However, section 404(a)(1)(A) does not specify the method by which the actual amount of the deduction may be determined.

The applicable limitations on contributions to CBA Plans in this case are contained in clauses (i) and (iii) of section 404(a)(1)(A), which together provide that the overall limitation is the greater of the amount necessary to satisfy the minimum funding standard of section 412(a) for plan years ending within the employer's taxable year, and an amount equal to the normal cost of the plan, augmented by any amount necessary to amortize unfunded costs equally over 10 years.  In addition, the flush language at the end of subparagraph (A) of the foregoing section provides, among other things, that the maximum amount deductible for the taxable year is to equal the full funding limitation for such year determined under section 412.

As a further refinement of the section 404(a) limitations on the deductibility of contributions, section 413 provides certain rules that apply exclusively to "Collectively bargained plans, etc."  Section 413(a) provides that subsection (b) applies to any plan (and any trust thereunder) maintained pursuant to a CBA; i.e., a CBA Plan.  Various paragraphs of subsection (b) provide rules that relate to CBA Plans, but the relevant paragraph for

the instant matter is paragraph (7), which furnishes a blueprint
for applying section 404(a) limitations insofar as they relate to
CBA Plans.  Section 413(b)(7) states:

> Deduction Limitations.-- Each applicable limitation
> provided by section 404(a) shall be determined as if
> all participants in the plan were employed by a single
> employer.  The amounts contributed to or under the plan
> by each employer who is a party to the agreement, for
> the portion of his taxable year which is included
> within such a plan year, shall be considered not to
> exceed such a limitation if the anticipated employer
> contributions for such plan year (determined in a
> manner consistent with the manner in which actual
> employer contributions for such plan year are
> determined) do not exceed such limitation.  If such
> anticipated contributions exceed such a limitation, the
> portion of each such employer's contributions which is
> not deductible under section 404 shall be determined in
> accordance with regulations prescribed by the
> Secretary.

Petitioner concedes in its brief that the facts and the
issue before us are "essentially identical" to that of a case
before the Court at the time the briefs were filed, which we have
since decided in favor of the Commissioner.  See Lucky Stores,
Inc., & Subs. v. Commissioner, 107 T.C. 1 (1996) (Lucky Stores
I).  Many of the arguments petitioner poses in the instant case
were discussed at length in Lucky Stores I, or in the
Supplemental Memorandum Opinion, Lucky Stores, Inc., & Subs. v.
Commissioner, T.C. Memo. 1997-70 (Lucky Stores II), and we need
not retread the same ground here.  However, we shall address
certain of petitioner's arguments pertaining to the deduction

limitations of section 404(a)(1)(A) and section 413(b)(7), and their relation to section 404(a)(6).

For the reasons detailed below, we conclude that petitioner, by its misguided attempt to use the expanded time of payment provision of section 404(a)(6) to augment its current contribution deduction, has run afoul of the deduction limits for individual employer contributors imposed by sections 404(a)(1)(A) and 413(b)(7). See <u>Lucky Stores, Inc., & Subs. v. Commissioner</u>, 107 T.C. at 12.

Sections 404(a)(1)(A) and 413(b)(7) place limits on the <u>overall</u> amount that may be deducted by <u>all</u> contributing employers to a CBA Plan for portions of their respective tax years included in a plan year. They do not detail the method by which the actual amount of the deduction of an <u>individual</u> employer contributor may be calculated. Nevertheless, in the absence of regulations promulgated by the Secretary, we think these sections outline the approach that should be taken to determine the permissible amount of each employer's deductions for contributions to a CBA Plan. The dominant themes we extrapolate from section 413(b)(7) to aid us in this regard are those of consistency and predictability.

Section 413(b)(7) provides a necessary fiction for employer contributors to ascertain whether they will exceed the overall

deduction limitation of section 404(a)(1)(A) for a given plan year since:  (1) They cannot know the exact amount of their required contributions for a plan year until the units of service are actually completed by their employees; (2) their tax years do not necessarily correspond with one another; and (3) employer contributors are not required to report to plan administrators the deductions they claim for contributions.  Section 413(b)(7) states that all employers' contributions for a plan year will not exceed the overall limit imposed by section 404(a)(1)(A) if the total anticipated contributions for the plan year do not exceed such limit.  Anticipated contributions for a plan year <u>must</u> be determined in a manner consistent with that in which actual contributions are determined.  Sec. 413(b)(7).  Actual contributions are calculated by plan administrators based on units of service worked within the 12-month plan year.

Petitioner presumes that, once the total anticipated contributions are found not to exceed the overall deductible limit, it can thereafter elect to augment the amount of its actual contributions for its tax year pursuant to section 404(a)(6) to take advantage of any leftover overall limitation for the corresponding plan year (the difference between full funding under section 412 and all anticipated employer contributions for that plan year).  Any other approach,

petitioner contends, in effect recalculates anticipated

contributions, which defeats Congress' intent in using the word

"anticipated".  Petitioner is mistaken on 2 counts.  First,

except to the limited extent discussed below, none of

petitioner's contributions qualify for section 404(a)(6)

treatment.  Second, petitioner fails to comply with the

individual deduction limits of section 404(a)(1)(A) and section

413(b)(7).

Section 404(a)(6) states:

> Time When Contributions Deemed Made.-- For purposes
> of paragraphs (1), (2), and (3), a taxpayer <u>shall</u> be
> deemed to have made a payment on the last day of the
> preceding taxable year if the payment is on account of
> such taxable year and is made not later than the time
> prescribed by law for filing the return for such
> taxable year (including extensions thereof).  [Emphasis
> added.]

If a taxpayer fulfills the above conditions, section 404(a)(6)

<u>automatically</u> applies; no election is required or contemplated

under the statute.  The operative language is "shall".

In arguing that it has complied with the foregoing

conditions, petitioner relies heavily on Rev. Rul. 76-28, 1976-1

C.B. 106, which offers guidelines to interpret the meaning of the

phrase "on account of".  In pertinent part, the ruling states:

> a payment made after the close of an employer's taxable
> year to which amended section 404(a)(6) applies shall
> be considered to be on account of the preceding taxable
> year if (a) the payment is treated by the plan in the
> same manner that the plan would treat a payment

actually received on the last day of such preceding taxable year of the employer, and (b) either of the following conditions is satisfied.

(1) The <u>employer designates</u> the payment in writing to the plan administrator or trustee as a payment on account of the employer's preceding taxable year, or

(2) The <u>employer claims</u> such payment as a deduction on his tax return for such preceding taxable year * * *. [Rev. Rul. 76-28, 1976-1 C.B. at 107; emphasis added.]

The underscored language above illustrates that Rev. Rul. 76-28 offers those employers to which it applies the opportunity for what is in effect an election under section 404(a)(6). In Lucky Stores I, we did not need to address the weight to be afforded Rev. Rul. 76-28 in the context of CBA Plans. <u>Lucky Stores, Inc., & Subs. v. Commissioner</u>, 107 T.C. at 13-14. We held that, in any event, grace period contributions based on services performed after the close of the taxable year were not "on account of" the earlier tax year in that the taxpayer had not proven that the "same treatment requirement" of Rev. Rul. 76-28 was satisfied. <u>Id.</u> (The only grace period contributions that we find to be "on account of" TYE 8801 and which, consequently, <u>must</u> be deducted in that year, are any delinquent payments and the payments for services performed in the last month of TYE 8801 but not paid until the first month of TYE 8901.)

We think that an individual employer's contributions and ensuing deductions for its tax year, in order to comport with anticipated contributions for the plan year on which the section 413(b)(7) deduction limit is based, must be limited to those contributions attributable to services performed over a 12-month period. Lucky Stores, Inc., & Subs. v. Commissioner, 107 T.C. at 14. Section 413(b)(7) states that each limit under section 404(a) shall be determined as if all plan participants were employed "by a single employer", which mandates uniformity of tax treatment for employer contributors even as their tax years are widely disparate. As a result, petitioner may not unilaterally and arbitrarily expand its deduction limitation, and thereby increase the amount of its deduction for its tax year, by including contributions in its tax year in a manner at odds with how anticipated contributions previously had been determined for the plan year in which its tax year falls. Id. (In response to one of petitioner's arguments, we recognize that, in certain limited situations, where the same plan year includes both the last day of an employer's tax year and the entire 8-1/2 month grace period that follows the tax year, the use of section 404(a)(6) in the manner advocated by petitioner, if permitted, would have no effect on an individual employer's anticipated contributions for the plan year. However, many employer

contributors would not fall under this category due to their widely varying tax years. Since these employer contributors could not also use section 404(a)(6) without impermissibly distorting their anticipated contributions, the requirement of uniform tax treatment would be violated if the individual employer whose anticipated contributions would be unaffected were able so to use section 404(a)(6). Sec. 413(b)(7).)

Under the 12-month limitation discussed above, anticipated contributions are easily forecast at the outset of a plan year; no recalculation is ever required. In order to arrive at anticipated employer contributions, each employer can examine prior years' Forms 5500 which indicate actual contributions to a plan for units of work performed during a plan year. Alternatively, an employer can ask the plan administrator to indicate the amount of contributions it expects to be due for units of service performed under the plan during the year.

Petitioner acknowledges that section 413(b)(7) establishes a means "whereby the party with the most information (i.e., the multiemployer plan) can determine in advance whether employer contributions will exceed the deductible limit." Yet, under petitioner's theory, a plan administrator could make no such determination. If an employer contributor could arbitrarily expand its actual contributions for its tax year by "electing" to

do so under section 404(a)(6), anticipated contributions for the corresponding plan year would become indeterminate and, therefore, unreliable. They would no longer approximate the amount of actual contributions for a plan year. This, in turn, would cause the section 413(b)(7) fiction to become unworkable, leading to the inability of a plan to prospectively determine whether the overall limit would be exceeded.

Petitioner attempts to finesse this point by positing that, whereas section 404(a)(6) deems a contribution to be made in an earlier _tax_ year, section 413(b)(7) measures employer contributions that are expected to be actually made to a Multiemployer Plan during its _plan_ year. Under this reasoning, the treatment of contributions pursuant to section 404(a)(6) does not affect the limits under section 413(b)(7). Petitioner asserts that section 404(a)(6) "expressly limits this deemed treatment" of grace period contributions in the preceding tax year to section 404(a). Petitioner then concludes that the tax year in which a contribution is deducted is "wholly irrelevant" under section 413(b)(7).

We disagree with the preceding disjunctive analysis. Petitioner ignores that section 413(b)(7) is merely an amplifying refinement of section 404(a) in the context of CBA Plans. See _Lucky Stores, Inc., & Subs. v. Commissioner_, 107 T.C. at 11.

Section 413(b)(7) even refers directly to section 404(a):  "Each applicable limitation provided by section 404(a) shall be determined".  As such, sections 404(a) and 413(b)(7) cannot be read separately.  Together, they enable individual employer contributors to determine their deduction limits in the tenebrous context of overlapping tax and plan years.  Consequently, section 404(a)(6), by its reference to section 404(a)(1) through (3), has an impact on section 413(b)(7).

Petitioner maintains that, if an individual employer's tax treatment of its contributions affects the deductibility of all contributions, administrators and other contributing employers could never know whether a contribution was in fact deductible.  That would no doubt be true under petitioner's approach, in which an employer's tax treatment is subject to its unilateral allocation of grace period contributions.  However, such a problem never arises if an employer contributor premises its deduction on services performed in its 12-month tax year.

Petitioner argues that the rationale of Airborne Freight Corp. v. United States, 76 AFTR 2d 95-7497, 96-1 USTC par. 50,004 (W.D. Wash. 1995), should prevail in the instant case.  However, as we noted in Lucky Stores II, the District Court did not directly confront the question of section 404(a) deduction limitations.  Lucky Stores, Inc., & Subs. v. Commissioner, T.C.

Memo. 1997-70. Rather, the court summarily opined that, because the taxpayer was late in filing its 1989 tax return, it could not have interfered with the ability of other employers to calculate and claim their deductions. <u>Airborne Freight Corp. v. United States</u>, 76 AFTR 2d 95-7497, at 95-7499, 96-1 USTC par. 50,004, at 83,015 (W.D. Wash. 1995). The District Court held that, since the "plan-wide deductible limit" had not been exceeded, the disputed deductions were permissible. <u>Id.</u> Such a conclusion can only be reached retrospectively, which is precisely what petitioner (correctly) opposes as contrary to Congress' intent. In addition, this holding does not recognize an employer contributor's individual deduction limit. We respectfully disagree with the District Court's analysis.

In our view, limiting each employer's deductions to contributions based on services performed in its 12-month tax year leads to the following salubrious results: (1) Deductions are predictable since they do not hinge on section 404(a)(6); and (2) no employer can usurp a greater share of a plan year's overall deduction limit at another's expense based on the vagaries of when its tax year ends in relation to that of other employers or when it files its return. Cf. <u>Airborne Freight Corp. v. United States</u>, 76 AFTR 2d 95-7497, at 95-7499, 96-1 USTC par. 50,004, at 83,015 (W.D. Wash. 1995) ("It seems only fair to

require that those employers who choose to file their tax returns later must accept the risk of possible limitations on their ability to claim deductions.").

Finally, sections 404(a) and 413(b)(7) offer employers a powerful incentive to participate in qualified plans. Employers obtain the significant tax advantage of a deduction for plan contributions in many cases years before the corresponding income is recognized by their employees. (In general, employee participants are not taxed until the time they receive distributions from a qualified plan, whereas an employer's contributions to a qualified plan are deductible when paid to the trust. In contrast, for nonqualified plans, an employer's contributions are not deductible when paid; they are deductible only when the employee participant reports the amount of the contribution as income. Sec. 404(a)(5).) However, sections 404(a) and 413(b)(7) impose restraints which cannot be disregarded. Petitioner baldly seeks to garner an additional tax benefit, permanent tax deferral, by its one-time bunching of up to 20-1/2 months of deductions in TYE 8801 for each of the 39 Multiemployer Plans to which it contributed. See Lucky Stores, Inc., & Subs. v. Commissioner, T.C. Memo. 1997-70. We are not convinced that Congress intended section 404(a)(6) to be read so expansively, or in a manner inconsistent with section 413(b)(7),

in furtherance of such a dubious goal.  We therefore hold that pension contributions, based on units of service worked after the close of TYE 8801 and before October 17, 1988, were not "on account of" TYE 8801, as required by section 404(a)(6), and are therefore not deductible in that year.

Issue 2.  The Vacation Pay Deductions

We now turn to the issue of whether certain vacation benefits were "earned" pursuant to section 463 by the end of TYE 8701 and TYE 8801 such that petitioner could take deductions for vacation pay liabilities in those years.  Section 463 was repealed by section 10201(a) of the Omnibus Budget Reconciliation Act of 1987, Pub. L. 100-203, 101 Stat. 1330-387, effective for taxable years beginning after December 31, 1987.

Prior to repeal, section 463 provided as follows:

> (a) Allowance Of Deduction.-- At the election of a taxpayer whose taxable income is computed under an accrual method of accounting, if the conditions of section 162(a) are otherwise satisfied, the deduction allowable under section 162(a) with respect to vacation pay shall be an amount equal to the sum of--
>
> (1) a reasonable addition to an account representing the taxpayer's liability for vacation pay earned by employees before the close of the taxable year and paid during the taxable year or within 8 1/2 months following the close of the taxable year * * *
>
> *    *    *    *    *    *    *
>
> Such liability for vacation pay earned before the close of the taxable year shall include amounts which, because of contingencies, would not (but for this

section) be deductible under section 162(a) as an accrued expense. * * * [Emphasis added.]

The Tax Reform Act of 1986, Pub. L. 99-514, sec. 1165(a), 100 Stat. 2511, amended section 463(a)(1) for tax years beginning after December 31, 1986.  Prior to the amendment, the section read "and expected to be paid during the taxable year or within 12 months following the close of the taxable year" in lieu of the underscored language above.

For our present purposes, it is helpful to review the history of vacation pay liability deductions antedating the enactment of section 463 by the Act to Amend the Tariff Schedules of the United States, Pub. L. 93-625, sec. 4(a), 88 Stat. 2108, 2109, for taxable years beginning after December 31, 1973.  Prior to 1954, in 2 published rulings under the 1939 Code, I.T. 3956, 1949-1 C.B. 78 and G.C.M. 25261, 1947-2 C.B. 44 (no date given), the IRS ruled that liability for vacations with pay may, with respect to some employees, be terminated, if the employment relationship is severed prior to the scheduled vacation period. Nevertheless, it is stated that this contingency should not preclude "the accrual of vacation pay at the end of the taxable year in which the services are performed, since, with respect to the individual employee at the end of such year, the employer would be justified in anticipating that the liability will be paid".  I.T. 3956, 1949-1 C.B. 78 (emphasis added).

Despite the existence of these taxpayer-friendly rulings, courts imposed a stricter standard for the accrual of vacation pay liabilities in instances where earned vacation pay entitlements were forfeitable due to post-yearend contingencies. E.g., E.H. Sheldon & Co. v. Commissioner, 19 T.C. 481 (1952), affd. in part and revd. in part 214 F.2d 655 (6th Cir. 1954); Tennessee Consol. Coal Co. v. Commissioner, 15 T.C. 424 (1950).

In light of these decisions, the IRS issued Rev. Rul. 54-608, 1954-2 C.B. 8, which revoked I.T. 3956 and modified G.C.M. 25261, 1947-2 C.B. 44. The ruling stated that employers must "clearly establish" the fact of liability to individual employees by the end of a tax year to accrue vacation pay in that year. Rev. Rul. 54-608, 1954-2 C.B. at 9-10. Consequently, if an employee had to remain employed beyond the end of the year and until the scheduled vacation period in order to fix the employer's liability, respondent did not consider the liability to be accruable.

To prevent hardship to taxpayers who had relied on I.T. 3956, Congress continually delayed the effective date of Rev. Rul. 54-608 while it studied the vacation pay issue. See Denver & Rio Grande W. R.R. v. Commissioner, 38 T.C. 557, 575-576 nn.8, 9 (1962). Congress subsequently enacted section 463 in direct response to the strict accrual doctrine set forth in the ruling.

The Senate report for Pub. L. 93-625 states that the repeal of I.T. 3956 "creates hardships for taxpayers who have been accruing vacation pay under plans which do not meet the requirements of the strict accrual rules set forth in * * * [Rev. Rul. 54-608]." S. Rept. 93-1357 (1974), 1975-1 C.B. 517, 521-522. The Senate report further states that section 463 "has been developed as a result of * * * [Congress' study of this problem] and insofar as accrued vacation pay is concerned the committee believes it represents the permanent legislation promised by the committees." Id. at 9, 1975-1 C.B. at 522.

Section 463 permitted taxpayers to elect to establish a reserve account for the accrual of vacation benefits. It authorized a yearend deduction for "earned" but unpaid vacation benefits which otherwise failed to satisfy the strict accrual test due to the existence of contingencies which could result in the forfeiture of leave entitlement. Sec. 463(a)(1). To qualify for deduction, the benefits also had to be payable to employees within 12 months after the end of the tax year (a period later reduced to 8-1/2 months for tax years beginning after December 31, 1986). Sec. 463(a)(1).

Petitioner accrued and deducted all vacation benefits that it expected to pay within 12 months of the close of TYE 8701 and within 8-1/2 months of the close of TYE 8801. The parties agree

that petitioner is entitled to the deductions, but they part company on the proper timing. Respondent contends that the 1987 vacation pay should have been deducted in TYE 8801 and the 1988 vacation pay ought to have been deducted in TYE 8901.

Although the term "earned" is not expressly defined in the statute or the legislative history, the parties both maintain that vacation pay is earned if it pertains to services performed before the close of a taxable year. The gravamen of the dispute, therefore, lies in whether vacation benefits under the General Plan, the Star Markets Plan and the Acme Market Plans were in fact attributable to services performed before the close of the taxable year for which the deductions were sought.

For reasons which follow, we hold that the vacation benefits were not earned before the end of each taxable year within the meaning of section 463. Consequently, the deductions must be taken in the subsequent taxable years.

A. Vacation Benefits Are Partially Based on Services Performed After the End of the Taxable Years

1. The General Plan

Petitioner argues that the only service requirement for receiving leave entitlement under the General Plan is employment for the 12 consecutive months preceding the grant date. Respondent, on the other hand, asserts that employees earned their respective vacation benefits only as services were rendered

over the 12-month period between consecutive anniversaries of the employees' initial dates of employment.

It is true for the General Plan that the granting of leave entitlement is conditioned on the performance of services during the 12 consecutive months preceding the date of grant (January 1). Nevertheless, as petitioner concedes, despite the employee's eligibility to take vested and nonvested leave after January 1, "the amount of the Leave Entitlement is based on the next anniversary of the employee's date of hire." As such, the leave entitlement is partially attributable to services performed after the end of the tax year. Thus, while an employee may have had to work the 12 months before January 1 to qualify for any vacation benefits, the extent of the benefits received upon satisfying that precondition hinged upon the years of service he was expected to complete on his next anniversary date. As evidence of this, vacation pay benefits are calculated using an employee's rate of pay at the time the vacation is actually taken, rather than the rate of pay at the end of the taxable year. Furthermore, petitioner's own vacation plan brochures used the term "earned" in the same manner as respondent does here.

2. The Star Markets Plan and Acme Markets Plans

That vacation pay benefits are partially based on services performed after the end of the relevant taxable year is even more

apparent under the Star Markets Plan and Acme Markets Plans. Unlike the General Plan, the Star Markets Plan and Acme Markets Plans provide no advance leave in the form of leave entitlement to employees. Rather, employees are not permitted to take any leave until all of the plans' service requirements are fulfilled. This occurs, at the earliest, on May 1 (the grant date), which is 3 months after the close of petitioner's taxable year.

Moreover, as with the General Plan, vacation pay benefits under the Star Markets Plan and Acme Markets Plans are calculated using an employee's rate of pay at the time the vacation is actually taken, rather than the rate of pay at the end of the taxable year.

B. Respondent's Disallowance of Claimed Deductions Does Not Render Section 463 Meaningless

1. The General Plan

Respondent contests petitioner's inclusion of the General Plan unused yearend nonvested leave entitlements in its calculation of vacation pay accruals under section 463 for TYE 8701 and TYE 8801. Petitioner asserts that vacation pay is earned as of the end of a tax year even if employees must perform additional services after the end of that year to absolutely fix an employer's obligation to provide the vacation pay. Petitioner posits that the fact that an individual employee did not have a nonforfeitable right to such vacation pay at the close of the

taxable year determines only whether the pay is accrued or vested, not whether it is earned. Petitioner submits that, when stripped of its trappings, respondent's position is simply that "earned" means accrued, which thereby renders section 463 meaningless.

Respondent, on the other hand, contends that nothing in section 463 signals that vacation pay is earned simply because the employer permits its employees to take vacations. Respondent acknowledges that, under the terms of the General Plan, whether vacation pay was earned happened to coincide with whether it had vested. Nevertheless, she states that, in making her determination, she was not swayed by inappropriate factors such as whether the vacation benefits were vested, nonvested, or contingent, or whether the vacation benefits were subject to conditions subsequent or precedent.

The Court is persuaded that respondent did not rely on a strict accrual doctrine in contravention of section 463 in disallowing certain deductions for TYE 8701 and TYE 8801 under the General Plan. Strict accrual would prohibit any deduction if a possibility existed that the vacation benefits could be forfeited after the end of the taxable year. See Rev. Rul. 54-608, 1954-2 C.B. 8. Such a possibility exists even for the taxable yearend "vested" benefits under the General Plan, because

of what is commonly called a "use-or-lose" provision in the plan. This provision requires participants to use their allocated vacation benefits by the end of the calendar year. If a participant fails to use all of the allocated leave, he receives no compensation for the unused leave remaining at the calendar yearend, and it cannot be carried over to the next year. Indeed, it appears to us that the principal reason for allowing an employee to take all of his leave as of January 1 is to ensure that all employees were able to take all of their leave entitlement without creating scheduling conflicts and without forfeiture. The use-or-lose provision applies to all leave allocated to an employee and does not distinguish between taxable yearend "vested" and "nonvested" benefits.

Due to the use-or-lose provision, there is no assurance as of the close of the taxable year that all otherwise "vested" vacation benefits will be used by participants by the end of the calendar year. Nevertheless, while the mere possibility of forfeiture would have precluded a deduction under the strict accrual doctrine espoused in Rev. Rul. 54-608, supra, respondent did not limit petitioner's deductions to yearend fixed and nonforfeitable vacation benefits in the instant case. Rather, she allowed deductions to the extent they were based on services performed in that taxable year.

2. The Star Markets Plan

Star Markets included both the yearend accumulated and nonaccumulated benefits in calculating its claimed vacation pay accruals under section 463 for TYE 8701 and TYE 8801. Respondent disputes petitioner's inclusion of the yearend nonaccumulated benefits in its calculation of accruals under section 463. Respondent claims she did not consider inappropriate factors such as whether the vacation benefits were vested, nonvested, contingent, or subject to conditions subsequent or precedent in making her adjustments.

We are convinced that respondent properly focused solely on whether the vacation pay was earned pursuant to section 463. Respondent allowed petitioner a deduction based on three-fourths of the unpaid yearend vacation benefits (May 1 through January 30 or 31), disallowing only the nonaccumulated benefits (January 30 or 31 to April 30), even though none of the benefits vested until May 1, and employees could not take any leave before their service requirements were met for the entire year.

3. The Acme Markets Plans

By the end of TYE 8701 and TYE 8801, employees covered by the Acme Markets Plans would have vested in three-quarters of the vacation benefits they anticipated receiving in the subsequent taxable year. The remaining one-quarter of Acme Markets Plans

vacation benefits would fully vest by the May 1 following the end of those taxable years.  Respondent disputes Acme Markets' inclusion of the nonvested benefits when calculating its vacation pay accruals under section 463.

Respondent correctly focused solely on the services performed by the end of the taxable year rather than the substantive rights of plan participants at the close of such year.  To wit, respondent allowed petitioner a deduction based on three-fourths of the unpaid yearend vacation benefits despite the fact the plans did not permit employees to take leave before the service requirements were fully met, and no benefits were actually granted until 3 months after the close of petitioner's taxable year.

For each of the plans, although respondent did not acquiesce in petitioner's excessively broad interpretation of section 463, neither did she disregard statutory language and legislative history which sought to liberate accruals of vacation pay from the strictures of Rev. Rul. 54-608.

C.  Petitioner's Attempt To Equate the Deductions At Issue with Deductions Allowed in I.T. 3956 Is Unavailing

We agree with petitioner that the legislative history discussed supra makes clear that section 463 was meant to apply to the type of vacation pay plan at issue in I.T. 3956, 1949-1 C.B. 78.  However, we are not convinced by petitioner's

comparison of the plans at issue in the instant case to the plan in I.T. 3956, supra, despite some shared characteristics.

In I.T. 3956, supra, a calendar year employer negotiated a vacation pay plan for its union employees pursuant to which eligible employees received a vacation entitlement on January 1 if they had worked 160 days in the preceding calendar year. The employer sought to deduct the vacation entitlement in the year in which the 160 days had been worked. The agreement further provided that vacations could be scheduled from January 1 to December 31, and that vacation pay was calculated using an employee's rate of pay at the time the vacation was actually taken. Moreover, no vacation with pay was due an employee whose employment relationship terminated prior to his scheduled vacation period.

I.T. 3956 concerned the accrual and deduction of vacation pay where the service requirements had already been fulfilled during the preceding calendar year, but where other provisions (such as termination of employment) could lead to the forfeiture of the earned leave. See Latrobe Steel Co. v. Commissioner, 62 T.C. 456, 465 (1974); Oberman Manufacturing Co. v. Commissioner, 47 T.C. 471, 477 (1967); Denver & Rio Grande W. R.R. v. Commissioner, 38 T.C. at 574. Although employees potentially had to remain employed well after the year of deduction to prevent a

forfeiture of their vacation entitlements, those entitlements were based solely on the 160 days of service rendered in the preceding calendar year.  The ruling did <u>not</u> address the issue of leave advances as provided by the General Plan.

Moreover, unlike I.T. 3956, for each of the plans at issue, the service requirements had only been partially fulfilled by the end of the respective taxable years.  Consistent with I.T. 3956, respondent disallowed petitioner's deductions only to the extent that the qualifying services had <u>not</u> been performed by the last day of TYE 8701 and TYE 8801.  Consequently, we hold that vacation pay, based on units of service worked after the close of TYE 8701 and TYE 8801 and before the due dates of those returns as extended, was not earned in TYE 8701 and TYE 8801, as required by section 463(a)(1), and is therefore not deductible in those years.

To reflect the foregoing and issues previously resolved,

<u>Decision will be entered under Rule 155</u>.